**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

| | |
|---|---|
| **PRISON LEGAL NEWS**, a project of the HUMAN RIGHTS DEFENSE CENTER, | |
| *Plaintiff*, | Case No.: _____ |
| v. | |
| **JAMES "J.J." JONES**, Sheriff of Knox County, Tennessee, in his official and individual capacities; **RODNEY BIVENS**, Assistant Chief Deputy of the Knox County Sheriff's Office, in his official and individual capacities; and **KNOX COUNTY, TENNESSEE**, | |
| *Defendants*. | JURY DEMAND |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

COMES NOW Plaintiff Prison Legal News ("PLN" or "Plaintiff"), by and through undersigned counsel, and states as follows for its Memorandum of Law in Support of its Motion for Preliminary Injunction:

The Knox County Jail (the "Jail") mail policy and practices prohibit delivery of journals, letters, and books to prisoners. Instead, all incoming and outgoing mail is restricted to postcards only, and no publications (including books and magazines) are permitted with limited exceptions, one of which is a narrow size restriction of 6" x 9." Additionally, the Jail fails to afford procedural due process to the sender of censored mail (nor does the policy contain a mechanism for the sender to receive due process). Consequently, the Jail has censored and is censoring numerous letters,

books, and monthly subscription journals that Prison Legal News mailed to Knox County prisoners.

Because the Defendants' ongoing conduct, supported by their policies and customs, violates the First and Fourteenth Amendments to the U.S. Constitution, PLN respectfully moves this Court for an order preliminarily enjoining Defendants from: (1) continuing to reject or otherwise censor Plaintiff's news journals, subscription materials, books, letters, and other correspondence; (2) imposing a narrow size limitation on books; (3) enforcing their unconstitutional "postcard-only" mail policy and practice; and (4) ordering Defendants to provide Plaintiff and other correspondents due process notice and an opportunity to challenge Defendants' censorship decisions in accordance with the law.

## STATEMENT OF THE FACTS

### I.    PARTIES

PLN, a not-for-profit project of the Human Rights Defense Center, publishes a monthly, 72-page journal of corrections news and analysis by the same name: *Prison Legal News*. (*See* Ex. A – Decl. of Paul Wright, ¶¶ 2, 12). PLN has thousands of subscribers in the United States and abroad, including attorneys, journalists, libraries, judges, and prisoners at about 2,600 correctional facilities, including the federal Bureau of Prisons, the Tennessee Department of Correction, as well as prisoners in death row units and "supermax" prisons, including the federal Administrative Maximum Facility ("ADX" or "Supermax") at Florence, Colorado - the most secure prison in the United States. (*Id.* at ¶ 4). PLN also publishes books about the criminal justice system and legal issues affecting prisoners and distributes approximately 50 legal and self-help books—some published by PLN and some by other publishers—to prisoners and the public. PLN's books foster in readers a better understanding of criminal justice policies and allow prisoners to educate

themselves about related issues, such as legal research, writing business-related letters, health care, and similar topics. (*Id.* at ¶¶ 13-14). As part of its organizational mission, PLN engages in core protected speech on matters of public concern, such as prison operations and conditions, legal updates on prison litigation, prisoner health and safety, and prisoners' rights. (*Id.* at ¶¶ 2, 5-6).

## II.   THE JAIL'S UNCONSTITUTIONAL POSTCARD-ONLY MAIL POLICY AND BAN ON PUBLICATIONS

Defendants have a formal and informal postcard-only policy, requiring all incoming mail addressed to prisoners at the Knox County jail, with the exception of legal mail, to be in the form of a "standard" postcard. Defendants' written policy on prisoner mail also effectively bans publications sent by mail to prisoners that do not fit on a "standard" postcard:

> All personal mail will be a standard postcard with printed postage "no physical stamps", white in color front and back and not to exceed standard measurements. Postcards will be purchased from the Commissary.

(*See* Ex. B – Policy 12.2).

Moreover, Defendants define "correspondence" as being "[c]ommunication to or from inmates *through postcards*." (*Id.*). (emphasis added). Defendants' website further states that only postcards will be accepted at the Jail. The website provides, in pertinent part:

> Inmates may receive correspondence only on a standard postcard, rectangular at least   3-1/2 inches high x 5 inches long x 0.007 inch thick no more than 4-1/4 inches high x 6 inches long x 0.016 inches thick.

*See* Sheriff of Knox County Website, www.knoxsheriff.org/jail (under heading "Mailing Address") (last visited Oct. 5, 2015)).

Defendants' written mail policy also bans all gift publications sent by third parties—including publishers—to prisoners, regardless of whether the publication is sent directly from the publisher to the prisoner:

> If an inmate cannot find the book they [sic] desire to read, then inmates will be allowed to have publications sent to them through the mail from the publisher while

incarcerated in any Knox County Sheriff's Corrections Facilities. These publications cannot be hardback and has [sic] to meet all criteria of the facility. All such documents must be approved by the Facility Commander or his/her designee.
…
Photo copied material from publications will be considered to be originals and not allowed.
…
If an inmate or a group of inmates desires a certain publication that is not available in the facility library, a written request may be submitted to the Facility Commander for approval.

(<u>Ex. B</u> at § (III)(K)).

Additionally, the Jail restricts delivery of books to prisoners unless they are sent from

private donors/sources to the Library Unit, and even then, subject to a very narrow size restriction

of 6" x 9:"

2. Various publications and books are available to inmates in the facility library.

3. Books may be received through the mail from private donors/sources to the Library Unit and will be coordinated by the Programs Manager under the following provisions:

     i.     No hardbacks allowed
     ii.    *Dimensions of the book will be no larger than 6 inch by 9 inch*
     iii.    No obscene, offensive or questionable material and/or subject matter deemed to be a security or threat issue
     iv.    Subject to approval by the mailroom and the library staff
     v.    Mailroom will keep a log of books that have been accepted and data of acceptance
     vi.    Only two books allowed in an inmate's possession/cell at a time

(*Id.*) (emphasis added). The Jail's inmate handbook further explicitly prohibits publications:

**Publications (magazines, books, newspapers, internet material, photo copies of Publications, etc.)**
Publications will <u>not</u> be accepted. Various publications/magazines are available to inmates in the facility library. If an inmate or group of inmates desires a certain publication that is not available in the library, a written request may be submitted to the Facility Commander or his/her designee for approval.

(<u>Ex. C</u> – Inmate Handbook, at 9).

Moreover, Defendants' official "Inmate Mail Rejection Notice" provides various checkboxes for officials to select when censoring the mail. (*See* <u>Ex. D</u> – Inmate Mail Rejection Notice). Among the categories of mail that may be rejected, according to the form, are "Publications, Non- Approved Religious Material, Books, Magazines, Newspaper, etc.," and "Correspondence does not meet the Requirements of a Post Card. Items Physically Attached. Oversized." (*Id.*).

Despite the policy allowing the *prisoner only* to be notified of the rejection of mail, Defendants have neither adhered to their policy nor afforded Plaintiff an opportunity to challenge any censorship decisions with regard to incoming or outgoing mail. (*See* <u>Ex. A.</u>, Wright Decl., at ¶¶ 10-11; <u>Ex. B.</u>, at § (III)(A)) ("Inmates are notified, in writing, when incoming or outgoing mail is withheld in part or in full."). Defendants' policy purports to require the Jail to provide prisoner-addressees notice when the Jail censors their incoming or outgoing mail. However, the policy fails to require or afford *any* notice to the publisher or other sender of incoming or outgoing mail. (*Id.*). Furthermore, the Inmate Handbook tells prisoners, "The Mail Clerk or a Correctional Officer will notify you if you receive any unauthorized mail and it will be returned to sender." (<u>Ex. C</u> at 8). However, the Inmate Handbook contains no appeal procedure, both for the prisoner-addressee and the non-incarcerated sender, and the Jail has not sent PLN *any* mail rejection notices or information about appeal rights. (<u>Ex. A</u>, Wright Decl., at ¶¶ 10-11).

III.   KNOX COUNTY'S CENSORSHIP OF PLN'S MAIL

Prisoners at the Jail desire to receive PLN's correspondence. (*See, e.g.*, <u>Ex. E</u> - Decl. of John Brown, at ¶¶ 3-6; <u>Ex. F</u> - Decl. of Thomas Davis, at ¶¶ 3-6; <u>Ex. G</u> - Decl. of Gregory Barner, at ¶¶ 3-6). Knox County prisoners specifically "would like to receive free reading material about

the law, the rights of prisoners and other topics related to jails and prisons from Prison Legal News" while they are incarcerated there. (*Id.*).

Since November 2014, Prison Legal News mailed its monthly journal, informational brochures, fundraising packets, subscription renewal letters, and books by U.S. Mail to prisoners at the Jail. (Ex. A, Wright Decl., at ¶ 10). However, the jail censored all the items that PLN mailed to multiple prisoners. (*Id.* at ¶¶ 11, 12, 15, 17-19; Ex. E, Brown Decl., at ¶¶ 7-8; Ex. F, Davis Decl., at ¶¶ 7-8; Ex. G, Barner Decl., at ¶¶ 7-8). Defendants did not notify PLN of any procedure for challenging rejection decisions or even give PLN a reason for the rejections. (*See* Ex. E, Brown Decl., at ¶ 11; Ex. F, Davis Decl., at ¶ 11; Ex. G, Barner Decl., at ¶ 11). Defendants did not inform PLN of the dates of their censorship of PLN's mail or the policy provisions that applied. (Ex. A., Wright Decl., at ¶¶ 10-12, 15).

Defendants censored all of PLN's monthly journals. (*Id.* at ¶¶ 10-12; *see also* Ex. E, Brown Decl., at ¶ 8; Ex. F, Davis Decl., at ¶ 8; Ex. G, Barner Decl., at ¶ 8). In all, the Defendants have censored at least 111 issues of the *Prison Legal News* journal since November 2014. (Ex. A., Wright Decl., at ¶ 12). The Defendants' rejection notices state that censored mail are placed in the intended recipient's property, which prisoners cannot access until they are discharged from the facility. (*See* Ex. D). Other times, the prisoner-addressees did not receive rejection notices at all. (*See e.g.,* Ex. E, Brown Decl., at ¶ 8). PLN is not aware of any of PLN's monthly journals being delivered as intended to prisoner-addressees. (Ex. A, Wright Decl., at ¶ 12).

Additionally, Defendants have censored informational brochure packets, subscription renewal letters, books, and fundraising packets (totaling 147 items) without affording PLN due process. (*Id.* at ¶¶ 10-11, 14-15, 17-19).

# ARGUMENT

## I.  PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is appropriate where a plaintiff demonstrates that the following four factors weigh in his or her favor: "(1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction." *Washington v. Reno*, 35 F. 3d 1093, 1099 (6th Cir. 1994) (internal citations omitted); *see also* FED. R. CIV. P. 65(a). Importantly, "the four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Id.*

Notwithstanding this balancing approach, "[w]hen a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Jones v. Caruso*, 569 F.3d 258, 265, 266 (6th Cir. 2009) ("the questions of harm to the parties and the public interest cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation," the "crucial inquiry" is often whether the challenged regulation is itself unconstitutional.).

## II.  PLN IS LIKELY TO SUCCEED ON THE MERITS.

### A.  PLN and Other Senders have a First Amendment Right to Communicate their Speech to Prisoners.

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482 U.S. 78, 84 (1987); nor do they bar others "from exercising their own constitutional rights by reaching out to those on the 'inside.'" *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989).  A publisher's right to send publications and other correspondence is clearly

established.  "[T]here is no question that publishers who wish to communicate with those who . . . willingly seek their point of view have a legitimate First Amendment interest in access to prisoners."  *Thornburgh*, 490 U.S. at 408.  PLN's speech covers topics of public concern and therefore "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted); *see also Pell v. Procunier,* 417 U.S. 817, 830 n. 7 (1974) ("[T]he conditions in this Nation's prisons are a matter that is both newsworthy and of great public importance.")

While this case involves the First Amendment rights of free persons, not prisoners, PLN assumes the Court will employ the four–pronged test outlined in *Turner v. Safley*, 482 U.S. 78 (1987), as a means of ensuring that any injunctive relief incorporates due deference for the exigencies of jail operation. A prison policy must be "reasonably related to legitimate penological interests," *id.* at 89, which requires a court to review four factors:

> (1) whether a valid and rational connection exists between the regulation and the asserted legitimate governmental interest, (2) whether alternative means of exercising the constitutional right remain available to inmates, (3) any effect accommodating the right would have on guards and inmates, and (4) the absence of ready alternatives.

*Turner*, 482 U.S. at 89–91. While respectful of correctional officials' expertise, *Turner's* "reasonableness standard is not toothless."  *Beard v. Banks*, 548 U.S. 521, 535 (2006) (citing *Thornburgh*, 490 U.S. at 414). Nor is *Turner* a "blank check to prison officials."  *Johnson v. California*, 543 U.S. 499, 547 (2005). That is, the government may not pile "conjecture upon conjecture" to justify infringement of constitutional rights. *Reed v. Faulkner*, 842 F. 2d 960, 963-64 (7th Cir. 1998). Rather, "[i]n order to warrant deference, prison officials *must present credible evidence* to support their stated penological goals."  *Beerheide v. Suthers*, 286 F.3d 1179, 1189 (10th Cir. 2002) (emphasis by court). Or, as the Sixth Circuit put it, prison officials do not set

constitutional standards by fiat. *Whitney v. Brown*, 882 F.2d 1068, 1074 (6th Cir. 1989).[1]

### 1. First *Turner* Factor: The Postcard-Only and Publication Ban Policies and Practices are Irrational.

The first *Turner* factor is binary: The court must determine whether the governmental objective underlying the regulation at issue is legitimate and neutral, and that the regulation is rationally related to that objective. *Thornburgh*, 490 U.S. at 414. This first factor can be, and in this case is, dispositive. "The rational relationship factor of the *Turner* standard is a *sine qua non*." *Prison Legal News v. Cook*, 238 F.3d 1145, 1151 (9th Cir. 2001) (citing *Walker*, 917 F.2d at 385) (holding that if the regulation is not rationally related to a legitimate penological objective, then the court need not consider the remaining *Turner* factors). In this case, the government's objective is not only not apparent; it cannot reasonably be argued that there is any "valid, rational connection" between the Jail's policies and practices and any legitimate governmental interest that could be put forward to justify them. Certainly, none of the justifications typically relied upon by corrections officials to restrict First Amendment rights in prison settings—security or safety and prisoner rehabilitation—can support an outright ban on communication, or the restriction to postcard correspondence.

### A. Bans on Publications and Size Restrictions Are Irrational.

Defendants' indiscriminate blanket prohibition against prisoners' receipt of any of PLN's publications "carries a heavy presumption of unconstitutionality." *Pepperling v. Crist*, 678 F.2d

---

[1] This principle is echoed in the decisions of other circuits as well. *See, e.g., Walker v. Sumner*, 917 F.2d 382, 386 (9th Cir. 1990) ("Prison authorities cannot rely on general or conclusory assertions to support their policies. Rather, they must first identify the specific penological interests involved and then demonstrate both that these specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests. *An evidentiary showing is required* as to each point.") (emphasis added); *Ramirez v. Pugh*, 379 F.3d 122, 128–29 (3rd Cir. 2004) ("[C]ourts may not abdicate their responsibility to scrutinize carefully the government's reasons for infringing [First Amendment rights] . . . . [A] district court must describe with particularity the specific rehabilitative goal or goals relied upon by the government to justify the challenged regulation.").

787, 791 (9th Cir. 1982). A jail may not institute wholesale exclusions of the types of publications

inmates may receive because blanket bans are neither limited to publications actually warranting

censorship nor offer publishers like PLN an alternative means to exercise their First Amendment

rights. In cases involving the mail policies of both prisons and jails, Courts have consistently issued

injunctions prohibiting such wholesale bans. *See e.g., PLN v. Lehman*, 397 F. 3d 692, 699–700

(9th Cir. 2005) (ban on non-subscription bulk mail and catalogs unconstitutional); *Jacklovich v.*

*Simmons*, 392 F.3d 420, 428 (10th Cir. 2004) (ban on gift publications unconstitutional); *Thomas*

*v. Leslie*, Nos. 97-3346, 97-3361, 1999 WL 281416 (10th Cir. Apr. 21, 1999) (absolute ban on

newspapers does not constitute a valid, rational connection between prison regulation and

governmental interest put forth to justify it); *Mann v. Smith*, 796 F.2d 79, 82 (5th Cir. 1986) (policy

of banning newspapers and magazines violated pretrial detainee's First Amendment rights);

*Kincaid v. Rusk*, 670 F.2d 737, 744 (7th Cir. 1982) ("Maintenance of security and discipline do

not justify the wholesale prohibition of pictorial magazines, hardbound books or newspapers.").[2]

---

[2] To avoid an injunction, defendants must be able to explain exactly how the content of PLN's books, monthly journal, and other correspondence is detrimental to the security, good order, or discipline of the institution. Moreover, in examining the first *Turner* factor in the *Thornburgh* case, the Supreme Court emphasized the "individualized nature" of the regulation at issue; no publication could be excluded "unless the warden himself makes the determination that it is 'detrimental to the security, good order, or discipline of the institution or…might facilitate criminal activity.'" *Thornburgh*, 490 U.S. at 416. No such individualized determinations have been made here. Instead, Jail staff categorically censors all mail from PLN's offices. Such a blanket ban deliberately eschews the type of individualized determination that comforted the *Thornburgh* Court. None of the books, issues of the journal, or other correspondence involved here pose even the slightest threat to any legitimate penological goals that Defendants might have and therefore should not be banned. PLN submits that the policy challenged here is actually counterproductive. The Jail's censorship of PLN's books, journals and other correspondence hampers the penological objective of rehabilitation. Most of the people incarcerated at the Jail are likely pretrial detainees, while some portion of that population is made up of convicted criminals serving their sentences. For those people, rehabilitation has been found to be a legitimate governmental objective. The Supreme Court has recognized that the "weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation." *Procunier v. Martinez*, 416 U.S. 396, 412–13 (1974) (overruled in part on other grounds by *Thornburgh*, 490 U.S. 401 (1989)).

For instance, John Clark, a nationally recognized expert on corrections (including having testified as an expert on behalf of the United States), who has extensive experience with prison mail policies and practices, has reviewed Defendants' mail policies and concluded the Jail's security is in no way enhanced by the mail policies at issue here—and in fact that the policies render the Jail less safe. (Ex. O., Decl. of John Clark, ¶¶ 1-10). The issue is further exacerbated, as Clark points out, by the fact that Knox County Jail does not even allow in-person visitation. Rather, all visitations are restricted to video-only. (*Id.* at ¶ 12). This isolation from their family, friends, and communities, coupled with the publication ban, serves only to inhibit rather than facilitate inmates' rehabilitation. (*Id.*). Moreover, the imposition of an arbitrary size restriction on books to 6" x 9" does not meaningfully improve security. (*Id.*). The fact that a book exceeds the size restriction has no real practical correlation to the time it takes to inspect the item, or its propensity to contain contraband. (*Id.*). The process of accepting an incoming book is the same regardless of its size. (*Id.*). Books like *The Habeas Citebook* present no more risk than smaller books and publications. (*Id.*). As Clark notes, the current book size restriction has absurd applications, given that technically, a book that is 6" x 9" but over 5" inches thick may be acceptable under certain circumstances, but a book that is 7" x 10" but 0.5" inches thick would not, which is counter-intuitive to the jail's security rationale. (*Id.*).

## B. Defendants' Postcard Only Policy and Practice is Irrational.

Defendants' only policy statement on their mail policy—baldly claiming "safety and security"—is insufficient to sustain Defendants' burden. (*See* Ex. B, at § (I)).[3] "There is not an

---

[3] The policy statement provides, in pertinent part:

> It is the policy of the Knox County Sheriff's Office Corrections Division to encourage correspondence between inmates and their families, friends and/or other associates to

intuitive, common-sense connection between the postcard-only policy and enhancing jail security." *PLN v. Columbia Cnty.*, 942 F. Supp. 2d 1068, 1083 (D. Ore. 2013). The *Columbia Cnty.* court concluded that the policy failed the *Turner* test because it "blocks one narrow avenue for the introduction of contraband—within envelopes—at too great an expense to the First Amendment rights of inmates and their correspondents." *Id.* at 1088. Federal courts have repeatedly found this security rationale unpersuasive, and courts have enjoined other, similar postcard-only policies.[4]

A recent publication of the Urban Institute's Justice Policy Center, *From the Classroom to the Community: Exploring the Role of Education during Incarceration and Reentry* (2009), noted the link between public safety and access to pro-social activities such as reading:

maintain community ties. The only restrictions to this right shall be those necessary to ensure the safety and security of the facility.

However, Defendants in their Inmate Handbook articulate a different justification:

All incoming/outgoing mail is subject to censorship and/or inspection for contraband or any other substantial governmental interest unrelated to the suppression of expression (i.e. detecting escape plans which constitute a threat to facility security and/or the well being of staff, public and/or other inmates). You will be notified if any of your mail is withheld.

(Ex. C, at 7).

[4] *See, e.g., Prison Legal News v. San Diego Cnty.*, No. 3:14-cv-2417-L-NLS (S.D. Cal. May 7, 2015) (enjoining postcard-only policy and finding that defendants failed to provide a persuasive explanation why a postcard-only policy is more effective at preventing the introduction of contraband than opening envelopes and inspecting their contents) (slip op. attached hereto as Ex. H); *Prison Legal News v. Lewis Cnty.*, No. 14-cv-5304 (W.D. Wash. 2014) (entering a preliminary injunction against the jail, finding that "[t]he postcard-only policy drastically reduces prisoners' and other correspondents' ability to communicate … [i]t is more than a mere inconvenience and becomes a substantial barrier to First Amendment rights.") (slip op. attached hereto as Ex. I); *Prison Legal News v. Cnty. of Ventura*, No. 14-773, 2014 WL 2736103, *4-8 (C.D. Cal. June 16, 2014) (ordering a preliminary injunction and later a stipulated permanent injunction preventing county jails from restricting incoming mail to postcards, and finding that there was no evidence that rescinding the postcard-only policy would make the jails less secure or cause a significant ripple effect on the allocation of jail resources) (attached hereto as Ex. J); *Prison Legal News v. Spokane Cnty.*, No. cv-11-029-RHW (E.D. Wash.) (approving consent decree finding that Spokane County did not articulate a legitimate penological interest for their mail policies restricting incoming mail to postcard form, and enjoining defendants from rejecting mail "on the ground that it is contained in an envelope rather than in postcard form") (attached hereto as Ex. K).

Research demonstrates that education can change thinking, encourage pro-social behavior, increase employment, and reduce recidivism. Education's power to transform lives in both tangible and intangible ways makes it one of the most valuable and effective tools we may have for helping people rebuild their lives after incarceration, as well as for combating crime and reducing criminal justice costs.

(*See* Ex. L - *From the Classroom to the Community*, at 42). The American Bar Association has also underscored the importance of mail to prisoners noting that "[m]ail is a crucial method by which prisoners maintain and build familial and community ties." (*See* Ex. M – *ABA Standards for Criminal Justice: Treatment of Prisoners*, 3d ed. (2011), at 264-66). Even the national detention standards for U.S. Immigration and Customs Enforcement facilities recognize the importance of detainees' ability to communicate by letters in envelopes requiring that "[f]acilities shall not limit detainees to postcards and shall allow envelope mailings." (*See* Ex. N – ICE Policy 5.1).

Moreover, current corrections industry practices confirm that "postcard-only" mail policies are irrational and likely to decrease institutional safety. Given the benefit of using written and printed materials to help prisoners in their reentry into society, the reduction of so-called "institution mentality," maintaining meaningful contacts with the outside world, and other benefits both to prisoners and the penal institution, Defendants' policies restricting letters and publications are detrimental to security and are irrational, poorly conceived, and not linked to the goal of improving safety and security. (Ex. O, Clark Decl., at ¶¶ 10-14).

In Mr. Clark's extensive experience with the federal Bureau of Prisons ("FBOP")—including his time as warden of federal facilities, including the Marion Supermax facility—allowing publications and letters "did not create any threat to the order or security of the then highest security federal prison in the United States." (*Id.* at ¶¶ 16-28). From Mr. Clark's work with more than 20 very secure pretrial detention facilities as the FBOP's assistant director for community corrections and detention services, Mr. Clark found that "FBOP's policy and practice

of allowing prisoners to receive letters and publications did not create any threat to the order or security of these pretrial facilities." (*Id.* at ¶¶ 25-28). "In fact, these policies and procedures were widely viewed by agency administrators as helping to mitigate inmate idleness and to strengthen family and community ties, thereby reinforcing the facilities' good order and security." (*Id.*).

Comparing industry leaders' practices to Knox County's practices, Mr. Clark found that the Knox County Jail's practices, including the "postcards-only" and publications policies, are much more restrictive than some of the country's most secure prisons. (*Id.* at ¶¶ 28-29). Moreover, Jail personnel have a variety of techniques to interdict the flow of contraband into the facility short of these blanket bans, and the industry-standard process of "inspecting individual letters would require only a very modest amount of time each day for a jail facility the size of Knox County jails." (*Id.* at ¶¶ 29-39). Further, because postcards are less private than letters, Defendants' "postcard-only" policy "creates additional security problems because inmates can more easily read the mail of other inmates." (*Id.* at ¶ 38).

In Mr. Clark's professional judgment, policies such as Defendants' "inhibit security and good order." (*Id.* at ¶ 42). With "reasonable security procedures commonly in place at detention facilities, jail security is not threatened by books and magazines sent by PLN," and, by contrast, interference with communication between prisoners and the outside world increases recidivism and causes alienation, frustration, and potentially disruptive behavior. (*Id.*); *see also Cnty. of Ventura*, 2014 WL 2519402 at *4 (when comparing postcard-only policy to "industry-standard inspection" of mail, "the rational relationship between the postcard-only policy and enhancing security dissolves.") (quoting *Columbia Cnty.*, 942 F. Supp. 2d at 1083).

Importantly, even if it could show that its postcard-only policy leads to some *de minimis* time or money savings, the Jail nevertheless cannot place constitutionally-protected speech on the

chopping block to cut costs. *See Roe v. Crawford*, 514 F.3d 789, 798 (8th Cir. 2008). Efficiency and cost-effectiveness are not the type of serious security concerns warranting the curtailment of speech. *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, – U.S. –, 131 S. Ct. 2806, 2824 (2011) ("[T]he First Amendment does not permit the State to sacrifice speech for efficiency."); *see also, Cnty. of Ventura*, 2014 WL 2519402 at *4-5 (rejecting jail's claim of increased safety and security, finding first *Turner* factor favors PLN, and enjoining postcard-only policy); *Columbia Cnty.*, 942 F. Supp. 2d at 1084-85 (same).

Because Defendants' policy fails under the first *Turner* factor, the policy is unconstitutional and the court need not analyze the other factors. *Muhammad*, 35 F.3d at 1084.

### 2. Second *Turner* Factor: Plaintiff Has No Reasonable Alternative to Express its Speech.

The second *Turner* factor is whether alternative means exist to exercise the constitutional right in question. The Supreme Court has made it clear that the absence of alternative means is evidence that the prison regulations in question are unreasonable. *Beard v. Banks*, 548 U.S. 521, 532 (2006) (*citing Overton v. Bazzetta*, 539 U.S. 126, 135 (2003) ("no alternative means of communication" is "some evidence" that prison regulations were unreasonable)).

### A. A Publication Ban Provides No Alternative Means.

Here, Defendants' censorship of all publications from PLN's offices bars PLN from any alternative means of exercising its constitutional rights. PLN cannot effectively or reasonably be expected to communicate its written speech by telephone or in–person with prisoners at each prison and jail presently being operated in America. (Ex. A, Wright Decl., at ¶¶ 9, 16). Nor are other forms of written communication available to PLN. (*Id.*). Indeed, the continued censorship of Plaintiff's mail demonstrates that Defendants will squelch any effort by PLN to deliver the

information contained in its books, journal, or other correspondence via some other printed form. PLN is left with no practical way to reach its intended audience.

### B. The Postcard-Only Policy and Practice Provide No Alternative Means.

PLN has no practical way to reach its intended audience given the government's postcard-only policy and practice that effectively bans PLN's speech. PLN cannot communicate its speech by postcards because its letters and brochures, which are sent to thousands of persons across the country, cannot fit on postcards, nor can PLN's books. (*See Id*. at ¶ 9). Like most publishers that produce a publication for a national audience, PLN cannot tailor its correspondence to the irrational requirements of a particular jail, and if PLN were to try, Defendants undoubtedly would object that PLN had flooded the Jail with tens of thousands to hundreds of thousands of postcards per prisoner. (*See* Ex. O., Clark Decl., at ¶¶ 11, 15-16, 30-33).

Courts have rejected mail policies requiring speech to be communicated in a particular medium. For example, in *Morrison v. Hall*, 261 F.3d 896 (9th Cir. 2001), the court rejected the prison's argument that it could ban bulk-rate mail because prisoners may alternatively listen to radio or watch television instead: "Although radio and television are alternative media by which inmates may receive information about the 'outside' world, they should not be considered a substitute for reading newspapers and magazines." *Id.* at 904. The Sixth Circuit has held limiting periodicals to "publishers only" is constitutional, but it has never held that banning the entire periodical medium—which Defendants' policy does—accords with the Constitution. *Ward v. Washtenaw Cnty. Sheriff's Dep't*, 881 F.2d 325, 330 (6th Cir. 1989); *see also Brooks*, 779 F.2d at 1180-81 (prison officials cannot withhold personal subscription publications, noting that "[l]ike personal correspondence, a subscription represents the exercise of volition by both sender and

recipient"). Twenty-five years ago, the Fifth Circuit rejected the same argument in *Mann v. Smith*, 796 F.2d 79, 83 (5th Cir. 1986):

> [T]he contents of television are different from what one finds in the printed media. It is not up to the Midland County Sheriff or this court to decide that television can adequately serve the first amendment right to receive protected materials.

"It is clear that various disciplinary avenues, aside from censorship, were available to defendants in plaintiff's case." *Valentine v. Gray*, 410 F. Supp. 1394, 1397 (S.D. Ohio 1975). Defendants can make no showing "of reasonable justification" under the second *Turner* factor given other available ways of combating contraband in the Jail. Absent such a justification, prisoners' access to periodicals like PLN's magazine cannot be circumscribed. *Id.*

### 3. Third *Turner* Factor: The Effect on Defendants' Resources is Negligible.

The third *Turner* factor considers the effect an accommodation of the constitutional right will have on prisoners, prison staff, and on resource allocation. *Turner*, 482 U.S. at 90. In this context, the Supreme Court has said that "the policies followed at other well–run institutions [are] relevant to a determination of the need for a particular type of restriction." *Martinez*, 416 U.S. at 414 n. 14. In other words, the fact that other institutions are effectively able to accommodate the constitutional right PLN seeks to exercise here is good evidence that Defendants' particular restriction is not necessary. Virtually all other prisons, jails, and detention centers in America, unlike here, permit the distribution and delivery of mail from publishers like PLN.

> *A. Accommodating Publishers' Rights by Permitting Its Publications Into the Jail Imposes No Significant Burden on Officials, Prisoners, or Allocation of Resources.*

Since its founding in 1990, PLN has sent copies of its monthly periodical publication *Prison Legal News*, books from PLN's bookstore, letters, fundraiser solicitations, brochures, and other communications to hundreds of thousands of prisoners nationwide and also to prisoners

internationally. (Ex. A., Wright Decl., at ¶ 4). Notably, PLN is not aware of any state or federal

prison where PLN's publications and other correspondence have created a security concern. (*Id.*

at ¶ 7). This is strong evidence that the third *Turner* factor also favors PLN.

> **B. The Elimination of Defendants' Postcard-Only Policy and Practice Imposes No Significant Burden on Officials, Prisoners, or Allocation of Resources.**

Although the third *Turner* factor "often weighs heavily when courts consider mail policies

that restrict potentially disruptive content, such as descriptions of violence, escape, or criminal

activity, sexually-explicit materials, and role-playing games," or "where the challenged regulation

saves the prison substantial resources[,]" the Jail's postcard-only policy has no direct effect on

potentially disruptive content and affords no substantial savings in resources. *Columbia Cnty.*, 942

F. Supp. 2d at 1085 (citing *Overton*, 539 U.S. at 135. If PLN tried to fit its publications on

postcards, the hundreds of thousands of postcards required to do so would impose an enormous

burden on the staff of the jail and resource allocation.

As stated earlier, "the policies followed at other well-run institutions [are] relevant to a

determination of the need for a particular type of restriction." *Morrison*, 261 F.3d at 905 (quoting

*Martinez*, 416 U.S. at 414 n. 14). PLN has sent its letters, books, and brochures via mail to more

thousands of subscribers (including the distribution of more than a million copies of PLN's

monthly journal) nationwide since its founding in 1990. (*See* Ex. A., Wright Decl., at ¶ 4). PLN

mails its magazine to about 2,600 correctional facilities each month in all 50 states, plus the FBOP,

including death row prisoners. (*Id.*). Notably, no state Department of Correction (including the

Tennessee Department of Correction), nor the federal Bureau of Prisons, restricts incoming or

outgoing prisoner correspondence to postcards. (*Id.*). Further, in Mr. Clark's broad-based, 40 years

of experience as a corrections professional (including at very high security facilities), he has "never

been associated with any correctional or detention institutions that have banned such publications or correspondence" as Defendants have done. (Ex. O at ¶ 10). The practices of "well-run institutions," *Martinez*, 416 U.S. at 414 n. 14, including the federal Supermax facility where Mr. Clark was the warden, demonstrate that this factor also favors PLN. (Ex. O at ¶¶ 17, 20-27).

The arbitrariness of Defendants' policies in this regard is underscored by the fact that the Tennessee Corrections Institute specifically has counseled jails in this District to halt postcard-only mail policies. (Ex. P., Decl. of Greg Simcox, at ¶ 13). The Corrections Institute's written standards nowhere suggest such a restrictive prisoner mail policy as Defendants have enacted here. (*See* Ex. Q., TCI Standards § 1400-1.11).

As noted above, Jail staff must already process all mail whether delivering or censoring and retaining or returning it, and the Jail processed mail through other methods before adopting the postcard-only policy. The Jail already screens outgoing mail that is not restricted to a postcard, as well as all legal and privileged mail. (*See* Ex. B., at §§ III(A)), III(I)). For these reasons, courts that have considered alleged time and resource savings in postcard-only cases have found the *de minimis* increase in time for processing correspondence sent via letters to be extremely minor. *See, e.g., Columbia Cnty.*, 942 F. Supp. 2d at 1084, 1086.

### 4. Fourth *Turner* Factor: Commonsense Alternatives are Readily Available to Replace the Publication Ban and Postcard-Only Policy and Practice.

Defendants' policy also fails under the fourth *Turner* factor, because the existence of "obvious, easy alternatives may be evidence that the regulation is not reasonable," but is instead an "'exaggerated response' to prison officials' concerns." *Turner*, 482 U.S. at 90. As the Supreme Court has recognized, if a "claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as

evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91. *See also Columbia Cnty.*, 942 F. Supp. 2d at 1086. Regardless of Defendants' claimed justifications, the fact that more than 2,600 correctional facilities nationwide, including maximum-security facilities, accept PLN's materials suggests that the Jail's ban is an exaggerated response. *See Hrdlicka v. Reniff*, 631 F.3d 1044, 1055 (9th Cir. 2011) (holding that widespread distribution of publisher's materials suggests jail bans may be exaggerated response).

There are a number of commonsense and easy alternatives that allow for screening of contraband while permitting the free flow of information, such as visual and physical inspection by mailroom personnel and x-ray and other detectors, in addition to random cell searches. (Ex. O., Clark Decl., at ¶ 30-31). These contraband-screening procedures for letters or publications "would require only a very modest amount of time" for facilities the size of the Knox County Jail. (*Id.*) As the court in *Columbia County* recognized—and as common sense demands—the correctional facility at issue in that case, like this one, inspected mail in envelopes prior to the enactment of the postcard-only policy. 2013 WL 1767847 at *12; *see also Cnty. of Ventura*, 2014 WL 2736103 at *7-8; *Cnty. of San Diego*, No. 3:14-cv-2417 at 6-8 (slip op.) (Ex. H) (crediting Mr. Clark's expert testimony, holding that postcard-only policy is not rationally related to a legitimate penological interest, and enjoining postcard-only jail mail policy). The same process would be applicable to the inspection of publications sent to the Jail. If a court finds that a restriction on First Amendment rights is an "exaggerated response" even to a legitimate concern, the restriction cannot stand. *Turner*, 482 U.S. at 91. The Knox County mail policy cannot withstand scrutiny.

**B.      Defendants' Policy Unconstitutionally Deprives PLN of Protections under the Due Process Clause.**

The Supreme Court long ago recognized that a publisher's right to communicate with prisoners is rooted not only in the First Amendment, but also in the Fourteenth Amendment. *Pell v. Procunier*, 417 U.S. 817, 832 (1974). Thus,

> [T]he decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards. The interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment. As such, it is protected from arbitrary governmental invasion[.]

*Martinez*, 416 U.S. at 417-18. Courts of appeal have reaffirmed the core principle that the Constitution requires prison officials to afford notice and an opportunity to appeal jails' censorship decisions. *See, e.g., Cook*, 238 F.3d at 1152-53; *Lehman*, 397 F.3d at 701; *Livingston Cnty.*, 796 F.3d at 648-49.

Publishers have a right to procedural due process because:

> Without notifying the free citizen of the impending rejection, he would not be able to challenge the decision which may infringe his right to free speech . . . [and] since the inmate-recipient would not have seen the contents of the withheld letter, he may require the aid of the author to meaningfully challenge the rejection decision.

*Martin v. Kelley*, 803 F.2d 236, 243-44 (6th Cir. 1986).

Courts, including the Sixth Circuit, have reached consensus that jails must afford senders due process. *Id.* (holding a mail censorship regulation must "provide that notice of rejection be given to the inmate-recipient," "require that notice and an opportunity to protest the decision be given to the author of the rejected letter," and "provide for an appeal of the rejection decision to an impartial third party prior to the letter being returned."); *see also Montcalm Pub. Corp. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996).

Defendants' mail policy plainly fails to provide either PLN or prisoners due process. The policy is facially unconstitutional, because it fails to include any notice or opportunity to protest the censorship be given to PLN. (*See generally* Ex. B); *Martinez*, 416 U.S. at 408 n. 11 (holding that the "decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards"); *Thompson v. Campbell*, 81 Fed. App'x 563, 570 (6th Cir. 2003) (adopting the rationale of *Cook* and *Lehman*); *Martin*, 803 F.2d at 243-44 (to comply with due process, a prison mail censorship regulation must provide that notice and opportunity to protest decision be given to author of rejected mail); *Livingston Cnty.*, 796 F.3d at 648.

Defendant's policy provides neither the prisoner nor the sender the opportunity for review by an "impartial third party prior to the letter being returned," as required by *Procunier v. Martinez*. *Martin*, 803 F.2d at 244.

Additionally, Defendants' mail rejection notice must be transmitted to the sender, PLN, but the notice itself fails to explain any appeal procedure. (*See* Ex. D).[5] PLN has not even received those brief mail rejection notices from the Jail, nor have Defendants informed PLN of the disposition of the items it mailed or provided PLN any opportunity to appeal the Jail's censorship decisions. (Ex. A., Wright Decl., at ¶¶ 10-12, 15); *see also Prison Legal News v. Sullivan Cnty., Tenn.*, No. 2:13-cv-266, Doc. 24 (E.D. Tenn. March 26, 2015) (slip op. at 11) (jail mail policy providing that only the prisoner may file an appeal of rejected mail likely violates Due Process Clause, and finding PLN would therefore likely succeed on the merits, that PLN "would continue

---

[5] Inmate Mail Rejection Notices do not provide any mechanism for appeal for the prisoner or notice or mechanism for appeal for outside correspondents, such as PLN. Exhibit D, for example, includes an "X" next to the category "Publications, Non- Approved [sic] Religious Material, Books, Magazines, newspaper, etc." This rejection notice also includes highlighting over the words "Publications, Non- Approved" and "Newspaper." In the field "Unauthorized Correspondence was Returned To," Jail officials typed and highlighted, "PLACED IN PROPERTY (PLN)," suggesting that the rejected item was merely stockpiled in the Jail's property without being returned to PLN with notice and a meaningful opportunity to challenge Defendants' censorship decisions.

to suffer irreparable harm by the violation of its Fourteenth Amendment rights if no proper policy is implemented to provide the minimal procedural safeguards," the adoption of a new policy would not be burdensome, and public has an interest in free flow of information) (attached hereto as Ex. R); *Prison Legal News v. Stolle*, No. 2:13-cv-424, 2015 WL 1487190, *10-15 (E.D. Va. March 31, 2015) (discussing in detail Due Process Clause's requirements in the prisoner mail rejection context, finding that merely placing rejected publications in the prisoner's "property" without providing PLN adequate notice or an opportunity to appeal violated the Due Process Clause, and granting summary judgment to PLN) (Ex. S); *Cnty. of San Diego*, *supra*, 3:14-cv-2417, at 18-20 (slip op.) (county gave "insufficient" notice to PLN regarding rejection, if they provided any notice at all, and giving PLN only summary information, such as "Return to Sender" or "Unacceptable Mail" "provide[d] no notice to PLN as to why the materials were rejected").

Defendants' policy facially violates the Due Process Clause. *See H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 619 (6th Cir. 2009) (stating "this court has repeatedly held that facially unconstitutional laws will not be enforced" and holding district court's refusal to enjoin facially unconstitutional law is "clearly an abuse of discretion").

## III.  THE REMAINING PRELIMINARY INJUNCTION FACTORS.

Because PLN is likely to succeed on the merits, "there is no issue as to the existence of the remaining preliminary injunction factors." *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010) (internal quotation marks omitted); *see also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is presumed."); *Livingston Cnty.*, 796 F.3d at 649; *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001) ("[I]f the plaintiff shows a

substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment.").

Even if the Court were to analyze the remaining preliminary injunction factors, PLN prevails. A minimal violation of the First Amendment constitutes irreparable injury, and the injury to PLN is not minimal. *Id.; see also Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (recognizing that the loss of First Amendment rights, even for a minimal period of time, constitutes irreparable harm). Furthermore, where the denial of a preliminary injunction is not fully compensable by monetary damages, the movant suffers irreparable harm. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

The irreparable harm PLN suffers is concrete, severe, and ongoing. Without due process, the Defendants will continue to censor Plaintiff's mail sent to prisoners by banning its journal, books, subscription forms, information packets, and other mailings containing core protected speech. In contrast, any potential injuries to Defendants are minimal and speculative. No great cost or expenditure of time is required to enjoin the Jail's unconstitutional policies to allow PLN to communicate with prisoners, and added inspection time, as noted above, is minimal at best. (Ex. O., Clark Decl., at ¶ 29) ("only a very modest amount of time"). Defendants would simply return to the status quo that existed *before* adopting their new mail policy. The balance of hardships therefore strongly favors Plaintiff. *See CLT Logistics v. River West Brands*, 777 F. Supp. 2d 1052, 1073 (E.D. Mich. 2011).

The First Amendment furthers a compelling public interest. "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). The public has an important interest in protecting the "marketplace of ideas" wherever it may be found, and in the continued

vitality of the Bill of Rights and Due Process Clause. At the core of the First Amendment is the right of the press to disseminate and exchange information on issues of public concern, especially where critical of the government. The public interest weighs strongly in favor of enjoining Defendants from enforcing their unconstitutional mail policies and requiring adequate due process to members of the public, including Plaintiff, who communicate with prisoners.

## CONCLUSION

Because Defendants' ongoing policies, practices, and customs unlawfully infringe Plaintiff's free-speech rights under the First and Fourteenth Amendments and its right to due process of law under the Fourteenth Amendment, the Court should GRANT Plaintiff's motion and enjoin Defendants' unconstitutional conduct.

Dated: October 6, 2015                     Respectfully submitted,

                                           s/Tricia Herzfeld
                                           Tricia Herzfeld (BPR No. 26014)
                                           Elliott Ozment (BPR No. 4331)
                                           William Patrick York II (BPR No. 30546)[6]
                                           OZMENT LAW
                                           1214 Murfreesboro Pike
                                           Nashville, TN 37217
                                           (615) 321-8888 (office)
                                           (615) 321-5230 (fax)
                                           tricia@ozmentlaw.com

                                           Gena Lewis (BPR No. 025020)
                                           LAW OFFICE OF GENA LEWIS
                                           400 Ellis Ave.
                                           P.O. Box 6004
                                           Maryville, TN 37802
                                           (865) 268-9911 (office)
                                           (865) 978-6605
                                           maryeugenialewis@yahoo.com

---

[6] Application for admission submitted.

Lance Weber (Florida No. 104550)[7]
Sabarish Neelakanta (Florida No. 26623) [8]
HUMAN RIGHTS DEFENSE CENTER
P.O. Box 1151
Lake Worth, FL 33460
(561) 360-2523
lweber@hrdc-law.org

*Attorneys for Plaintiff PLN*

## CERTIFICATE OF SERVICE

I, Tricia R. Herzfeld, one of Plaintiff's attorneys, certify that I caused a copy of the foregoing document to be served by operation of U.S. Mail upon the following attorneys on October 6, 2015:

Richard Armstrong
Law Director
Knox County, Tennessee
400 Main St., Ste. 612
Knoxville, TN 37902

Respectfully submitted,

s/Tricia Herzfeld
Tricia Herzfeld (BPR No. 26014)

*One of Plaintiff's Attorneys*

---

[7] Application for admission *pro hac vice* forthcoming.
[8] Application for admission *pro hac vice* forthcoming.