**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION**

| | |
|---|---|
| **PRISON LEGAL NEWS**, a project of the HUMAN RIGHTS DEFENSE CENTER, | |
| *Plaintiff*, | Case No.: _____ |
| v. | |
| **JAMES "J.J." JONES**, Sheriff of Knox County, Tennessee, in his official and individual capacities; **RODNEY BIVENS**, Assistant Chief Deputy of the Knox County Sheriff's Office, in his official and individual capacities; and **KNOX COUNTY, TENNESSEE**, | |
| *Defendants*. | JURY DEMAND |

---

**DECLARATION OF JOHN L. CLARK IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

I, John L. Clark, declare:

1.     My name is John L. Clark. I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify. I make this declaration in support of Plaintiff's Motion for Preliminary Injunction.

**My Background**

2.     I am a corrections professional who has been involved in corrections for over 40 years, including 24 years at the Federal Bureau of Prisons ("FBOP"). My resume detailing my work history is attached hereto as **Exhibit O-1**.

3.     While at FBOP, I worked in seven different facilities, including serving as the

warden at both the Metropolitan Correctional Center in Miami, Florida ("MCC Miami," or the "Federal Detention Center Miami") and the United States Penitentiary in Marion, Illinois ("USP Marion").

4. From 1991 to 1997, I served as Assistant Director of FBOP, Chief of the Community Corrections and Detention Division. As assistant director, I oversaw agency policy on all detention-related issues and operations, including the coordination of the operations of all federal pretrial facilities. I regularly visited each federal detention center to review and assess operations.

5. After completing my tenure as Assistant Director at FBOP, Attorney General Janet Reno appointed me to manage a Congressionally-established agency tasked with closing the Lorton Correctional Complex (seven prisons in total) operated by the District of Columbia, transferring its 8,000 inmates to federal custody. I managed the agency from 1997 to 2002, at which time the transfer was complete and the agency closed. During that time, my staff and I coordinated the rewriting of the agency's mail policies.

6. During this period, Attorney General Reno commissioned me to investigate and prepare a report on the infamous escape of six Washington, D.C. prisoners serving life terms in a Youngstown, Ohio prison operated by the Corrections Corporation of America. I led a team which produced a 300-page report on the escape. I also testified before committees of the U.S. House of Representatives and the D.C. City Council about our findings.

7. After completing the Lorton transfer, I worked as a management consultant for several federal agencies between 2002 and 2009, including the U.S. Marshals Service and the Office of the Federal Detention Trustee in the U.S. Department of Justice. I coordinated oversight of local detention facilities used by the Marshals Service for detaining federal pretrial

prisoners. In the course of these duties, I became familiar with the operation of hundreds of local facilities with contracts to detain federal pretrial prisoners. I also visited a number of local detention facilities.

8. I have served as an expert witness on behalf of the United States of America as intervenor in *Prison Legal News v. DeWitt et al.*, Case No. 2:10-cv-02594-MBS (D. S.C.), involving the mail and correspondence policies of a local detention facility in Berkeley County, South Carolina; and am serving as an expert witness on behalf of the Plaintiffs in *Holbrook et al. v. Jellen et al.*, No. 3:14-cv-00028 (M.D. Pa.). I am also serving or have served as an expert on behalf of Prison Legal News in *Prison Legal News v. Wickersham et al.*, Case No. 2:15-cv-12350-AC-MJH E.D. MI); *Prison Legal News v. San Diego County, et al.*, Case No., 3:14-cv-02417-L-NLS (S.D. Cal.); *Prison Legal News v. County of Ventura, et al.*, Case No., 14-0773-GHK (EX), (C.D. Cal.); *Prison Legal News v. Jones et al.*, Case No. 2:11-cv-00907-JAM-DAD (E.D. Cal.); and *Prison Legal News v. Babeu et al.,* Case No. 2:11-cv-01761-GMS involving the mail and correspondence policies of local detention facilities in: Macomb County, Michigan; San Diego County, California; Ventura County, California; Sacramento County, California; and Pinal County, Arizona, respectively. I am also currently serving as an expert in *United States of America v. Secretary, Florida Department of Corrections*, Case No. 1:12-cv-22958-Seitz (S.D. Fla.), a case regarding the provision of Kosher meals. Finally, I served as an expert on behalf of the United States of America, an intervenor, in *Basra v. Cate et al.*, Case No. 2:11-cv-01676-SVW-FMO (C.D. Cal.), involving a Sikh inmate penalized for refusing to trim his beard.

## Summary of My Opinions in this Matter

9. Prison Legal News ("PLN") asked me to provide my opinion about Knox County's refusal to deliver PLN's publications and correspondence sent to prisoners in Knox County jail. Specifically, I examined the possible effects on detention operations of allowing the

delivery of PLN books, its monthly journal *Prison Legal News* and envelopes containing mail from PLN, including PLN's brochure packets sent to inmates. I have also reviewed the Knox County Sheriff's postcard-only mail policy and publication policy (Policy 12.2), the Sheriff's policy on personal and professional visits (Policy 12.3), the inmate handbook regarding mail and publications, and the Sheriff's mail policy as it appears on the website for the Knox County Sheriff. The specific provisions reviewed are:

## Policy 12.2 – Inmate Mail

II. Definitions

Personal Mail: All personal mail will be a standard postcard with printed postage "no physical stamps", white in color front and back and not to exceed standard measurements. Postcards will be purchased from the Commissary. All personal mail will be inspected for contraband.

. . .

Correspondence: Communication to or from inmates through postcards. . . .

III. Procedures. . .

H. Delivery Mail. . . .

5. Inmates housed in the Special Management Units of the facility will be allowed to write and receive postcards on the same basis as inmates in the general population. . . .

K. Publications/ /Books [sic]

1. If an inmate cannot find the book they [sic] desire to read, then inmates will be allowed to have publications sent to them through the mail from the publisher while incarcerated in any Knox County Sheriff's Corrections Facilities. These publications cannot be hardback and has [sic] to meet all criteria of the facility. All such documents must be approved by the Facility Commander or his/her designee.

2. Various publications and books are available to inmates in the facility library.

3. Books may be received through the mail from private donors/sources to the Library Unit and will be coordinated by the Programs Manager under the following provisions:

i.     No hardbacks allowed
ii.    Dimensions of the book will be no larger than 6 inch by 9 inch

iii.   No obscene, offensive or questionable material and/or subject matter deemed to be a security or threat issue
iv.   Subject to approval by the mailroom and the library staff
v.   Mailroom will keep a log of books that have been accepted and data of acceptance
vi.   Only two books allowed in an inmate's possession/cell at a time

. . .

NOTE: It is understood and agreed to by the inmate, that once he/she has read the book, it will be placed in their property or they can donate the book(s) to the Knox County Sheriff's Office Correctional Facility Library Unit.

NOTE: Photo copied material from publications will be considered to be originals and not allowed. . . .

4.  If an inmate or a group of inmates desires a certain publication that is not available in the facility library, a written request may be submitted to the Facility Commander for approval.

. . .

M. Delivery of Mail . . .

4. Inmates may only keep ten (10) postcards in their cell at any given time.  All other correspondence will be removed from the housing area and placed in the inmate's property (whereupon, the property may then be released by the inmate to a family member or friend). . . .

N. Specific Restrictions . . .

2. No internet printed material will be accepted without the approval of the Facility Commander or his/her designee.

. . .

**Personal and Professional Visits to Inmates**

III. Procedures:

A.  Knox County Correctional Facilities use video visitation as the only method for personal visits

. . .

D. Contact Visits (Personal Visits Only)

1.  Due to the physical design, the safety and security of all staff, visitors and inmates of the Knox County Corrections Facilities, inmates will not be permitted to have personal contact visits unless ordered by the court.

**Inmate Handbook**

10. Publications (magazines, books, newspapers, internet material, photo copies of Publications, etc.)

Publications will <u>not</u> be allowed. Various publications/magazines are available to inmates in the facility library. If an inmate or group of inmates desires a certain publication that is not available in the library, a written request may be submitted to the Facility Commander or his/her designee for approval. (emphasis in original).

## **Knox County Sheriff Jail Website**

Inmates may receive correspondence only on a standard postcard, rectangular at least 3-1/2 inches high x 5 inches long x 0.007 inch thick no more than 4-1/4 inches high x 6 inches long x 0.016 inches thick.

10.     Knox County's mail policies, and mail policies from any penal institution that prohibit books, letter correspondence or magazines, are inconsistent with widely-accepted detention practices.  In my forty (40) years as a corrections and detention professional, I have never been associated with any correctional or detention institutions that restricted correspondence to postcards only, banned the delivery of all publications sent to individual prisoners, or made provisions for private donors/sources to deliver books exclusively to prisoners, if the books conform to a certain size (*i.e.* "6 in. x 9 in."). Managed appropriately, jail security is not in any way threatened by books, periodicals, letter correspondence or books which happen to exceed the size limitation established by the Knox County Sheriff.  These policies banning the publications and correspondence at issue here actually make the jails less safe by limiting written and printed materials that can assist prisoners in planning for their reentry into society on release, and that can mitigate the harmful effects of idleness on a detention environment. The maintenance of frequent and meaningful contact between prisoners and their family and friends from their communities has a powerful impact on prisoners' rehabilitation and public safety. Consistent communication with outside networks serves a valid, rational connection to the penological purpose of rehabilitation and for decreasing chances of recidivism.

### **Importance of Communications from the Outside World**

11.     Detention professionals widely recognize that providing inmates access to reading material and to meaningful communications with friends and family are essential aspects of good

detention management. Personal correspondence from friends and family is highly valued by inmates and generally has positive overall effects on inmates, their families and staff persons. Inmates who maintain family ties are less likely to adopt behaviors of hardened criminals and become part of a prison subculture. This communication will decrease the likelihood of inmates developing and adopting an institution mentality that they would carry with them upon release. Accordingly, encouraging communication between inmates and their families promotes order and security in detention facilities as well as in the community. There is an increased likelihood of success upon release when there has been meaningful and consistent contact with outside support networks while incarcerated. Due to the high cost of telephone calls, the high cost of remote video visitation, and the logistical difficulties presented by having in-person visitation (scheduling conflicts, transportation difficulties, long distances, etc.), letter writing is the most common form of communication used by inmates. So the encouragement of meaningful contact between inmates and their families and other support networks via letters promotes public safety.

12.     The issue of meaningful communication is further compounded by the fact that Knox County Jail does not even allow in-person visitation. Rather, all visitations are restricted to video-only.  The total lack of in-person visitation serves to further isolate prisoners from their family, friends, and indeed the communities to which many of them will return.  This isolation coupled with the inability to receive meaningful correspondence in the form of a letter, and the restrictions on receipt of books and other publications all serve to inhibit rather than facilitate rehabilitation.

13.     Another important aspect of encouraging consistent communication with outside support networks is the mental health of the inmates. Because the inherent nature of imprisonment leads to isolation, inmates may develop serious mental health issues or pre-

existing mental health issues may worsen. The period when an inmate is first confined in a local detention facility after being arrested is an especially sensitive time for many individuals, and is the time when inmates most often attempt to harm themselves. Anything that helps inmates settle themselves down during such a period helps improve safety in a detention facility. Increased isolation along with decreased opportunities for communication with support networks can lead to psychotic breaks within and outside of the prison walls. Thus, consistent communication is extremely important for the wellbeing of inmates, prison staff, and the general public.

14.     In addition to meaningful contact with friends and family, providing mental stimulation to prisoners and detainees through reading material is a valuable tool in maintaining order and security within correctional facilities. Reading can play an important role in maintaining prisoners' and detainees' healthy interest in and awareness of life in the broader community, and in preparing them for life after confinement. The closed environment of penal institutions inherently breeds boredom, frustration, and tensions among inmates that can result in aggressive or disruptive behavior. For this reason, providing mental stimulation is a vital aspect of good corrections management. The greater an individual's access – within reasonable limits – to reading materials of various kinds, the less apt he or she is to grow angry or frustrated with the idle existence of life inside prisons and detention centers.

15.     Access to reading material with information about the outside world is an important component of prisoners' and detainees' rehabilitation. Educational materials, newspapers, books, and magazines broaden prisoners' and detainees' ability to function in and relate to mainstream society upon their release. A recent publication of the Urban Institute's Justice Policy Center, *From the Classroom to the Community: Exploring the Role of Education during Incarceration and Reentry* (2009), noted the link between public safety and access to pro-

social activities such as reading: "Research demonstrates that education can change thinking, encourage pro-social behavior, increase employment, and reduce recidivism. Education's power to transform lives in both tangible and intangible ways makes it one of the most valuable and effective tools we may have for helping people rebuild their lives after incarceration, as well as for combating crime and reducing criminal justice costs." *Id.* at 42.

### My Experience with the Federal Bureau of Prisons and Its Mail and Correspondence Policies

16.     FBOP recognizes the integral role played by reading material in managing prisoners and detainees in a correctional setting. FBOP allows federal prisoners and detainees in each of its facilities to receive letters and access a wide variety of books, magazines, newspapers, and education materials. While FBOP controls the overall volume of reading materials an inmate may possess, it has no rules prohibiting literature that offers subscription materials, photocopies, or correspondence containing legal decisions. FBOP applies its policies on reading material to a diverse population of prisoners and pretrial detainees encompassing a wide range of security levels and presenting an array of sophisticated threats to maintaining security and good order. FBOP's network of facilities includes eleven major pretrial detention centers, most holding from 800 to 1,500 detainees, and approximately twelve somewhat smaller pretrial detention facilities. The policies described above are followed at each of FBOP's pretrial detention facilities, including the Federal Correctional Institute, Memphis. These detention facilities serve a function on the federal level in major metropolitan areas similar to that of Knox County jails on the local level.

17.     Similar to the policies of many other correctional and detention facilities in the United States, FBOP's policies reflect the importance of allowing prisoners and detainees to access reading material in penal settings.

18.     I have applied FBOP's mail policies as warden of two high profile federal facilities: MCC Miami and the USP Marion Supermax facility, as well as in my later capacity as

the agency's Assistant Director overseeing and coordinating policy at all the FBOP's pretrial facilities.

### Metropolitan Correctional Center (Miami, Florida)

19.     I served as warden of MCC for two years, from 1988 to 1989. At that time, the facility housed approximately 1,000 detainees in a space designed to accommodate only 400.

20.     Each of these detainees was charged with a federal felony. Occupants of MCC Miami included many extremely violent offenders, dangerous drug dealers, organized crime figures, a terrorist accused of bombing an airliner, and other notorious criminals. Former Panamanian dictator Manuel Noriega was sent to the facility after his seizure by the U.S. military in 1990, and remained incarcerated there for many years after his conviction.

21.     Ensuring detainees' access to publications and correspondence has long been an important component of corrections management at MCC Miami. This facility currently allows inmates to receive hard cover and soft cover books, newspapers, and magazines, as long as such materials are sent from a publisher, bookstore, or book club. Detainees may possess up to five books and three magazines at a time. These regulations are substantially similar to the mail policies in place while I was warden of MCC Miami. During that time, detainees were allowed to receive letters, books, magazines, and newspapers. In fact, so many detainees subscribed to the *Miami Herald* during my tenure that a delivery truck made daily stops at the facility to deliver dozens of newspapers to detainees.

### U.S. Penitentiary (Marion, Illinois)

22.     I left MCC Miami in 1989 to become Warden of USP Marion – then the highest security federal prison in the United States. USP Marion opened in 1963 as a maximum security penitentiary to replace Alcatraz and house the nation's most dangerous federal criminals. USP Marion continued to carry out this critical mission until 1993, when FBOP completed the construction of a new administrative maximum security facility in Florence, Colorado.

23.     USP Marion has incarcerated some of the most inventive and violent criminals in

American history, including mob bosses John Gotti and Demeco Scarfo. During my tenure as warden, USP Marion also housed the most escape-prone prisoners in federal custody.

24.     During my tenure from 1989 to 1991, USP Marion permitted its prisoners to receive letters, books, newspapers, and magazines that were sent directly from publishers. Allowing USP Marion's prisoners to access such correspondence and reading material was a component of effectively managing the facility's high security population. The policy of allowing prisoners to receive letters and publications did not create any threat to the order or security of the then highest security federal prison in the United States.

### *Assistant Director over Pretrial Detention Services*

25.     From 1991 to 1997 I served in Washington, D.C. on the FBOP Director's executive staff in the role of the agency's Assistant Director for Community Corrections and Detention Services.

26.     In that capacity I oversaw and coordinated agency policy in all of the FBOP's pretrial facilities. These included more than 20 very secure detention centers of various sizes, including the Federal Detention Center in Memphis, Tennessee, which is associated with the Federal Correctional Institution at Memphis. Maintaining security and good order in these facilities was a challenging and complex task, as these detention centers frequently held dangerous high security prisoners who posed grave security risks during the time they were held for appearances and trial in federal courts.

27.     In this position, I regularly traveled to and reviewed the security and operations of all of the federal pretrial detention facilities. I also had responsibility for coordinating the agency's thirty community field offices around the country which provided oversight for hundreds of local detention facilities with which the FBOP maintained contracts to hold federal prisoners. I also made frequent visits to inspect many of the local contract jails and centers.

28.     During this six year period, it was again my ongoing experience that the FBOP's policy and practice of allowing prisoners to receive letters and publications did not create any threat to the order or security of these pretrial facilities. In fact, these policies and procedures

were widely viewed by agency administrators as helping to mitigate inmate idleness and to strengthen family and community ties, thereby reinforcing the facilities' good order and security.

## Knox County's Mail Policies and Practices

### *Postcard-Only Restriction and Publication Ban Policies and Practices*

29.    I have reviewed the postcard-only mail policy and the provisions of the inmate handbook regarding the handling of mail, as well as the mail policy banning publications sent to individual prisoners, and the policy stated on the Knox County Sheriff's website, which further address the postcard only policy.  These policies and practices are contrary to widely accepted detention practices. I have never been associated with a facility that restricted written correspondence with prisoners to the form of postcards only, or banned the delivery of publications generally. Some of the most notorious criminals, housed in maximum security facilities, have less restrictive access to communication with the outside world. Permissible mail correspondence is much broader in these federal facilities than in Knox County jails.

30.    In my experience, allowing inmates to receive letters and documents in envelopes does not pose a significant threat to safety and security. Detention staff persons who work in jail mailrooms have a variety of means by which they can detect and intercept contraband that might be sent to inmates inside envelopes through the mail. These range from simple techniques such as visual and physical inspection to the use of more sophisticated tools such as x-ray machines and drug or metal detectors. Detention facilities also often already use techniques such as random cell and inmate searches to detect any contraband that has already entered the facility. These techniques have been successfully used for decades to intercept contraband in detention facilities. Based on my experience overseeing mail rooms in federal detention facilities, this process of inspecting individual letters would require only a very modest amount of time each day for a jail facility the size of Knox County jails.

31.    The same security protocols and procedure that govern review of incoming

enveloped mail can be equally adopted for review of books, magazines or other publications. Based on my experience in corrections management, I find that Knox County Jail's policy of excluding virtually all reading material is not founded on principles of good correctional management and is not rationally related to the goal of maintaining good order and security. To the contrary, such practices have the foreseeable effect of undermining these fundamental correctional goals.

32.    As discussed above, overly restrictive rules like the postcard-only mail policy and a blanket ban on publications actually undermine public safety by unnecessarily limiting contact with the outside world. From a security perspective, this policy is short-sighted and could actually make the jails more difficult to manage because, in my experience, inmates who are engaged in meaningful communications with family and friends are easier for detention staff to manage.

33.    Such rules also undermine the maintenance of strong relationships between inmates and the members of their communities (including family, friends and employment/professional contacts) that can prepare them for life beyond their detention. Letter writing is the most readily available and cost-effective means of communication between inmates and their non-incarcerated family members. Because the physical movement of inmates is severely restricted, they are unable to visit with their family members frequently enough and for long enough periods of time to communicate meaningfully even if their family members are physically able to visit the jail. In this case, even if family members are able to visit the jail, they are still restricted from any sort of live, in person visitation.

34.    There may be some legitimate correctional concern with the accumulation of excess personal property in the cell area of prisoners, especially where the volume reaches the point where staff efforts to make searches in an expeditious fashion is impeded or where there may be a fire danger.  However, the limit of ten postcards is much more severe than necessary to prevent any realistic threat to legitimate security concerns. In my experience, allowing prisoners to hold at least the equivalent volume of one or two shoe boxes in no way hinders good

institutional security procedures.

35.     As an additional consideration about this extreme limit, I submit that letters or written communications from family members or friends in the community frequently offer solace or advice which prisoners find of great personal or sentimental value, especially when they have extended stretches of idleness. Some often spend free time reading and re-reading such personal letters.  A policy which permits prisoners to retain a larger but manageable amount of such personal mail not only benefits prisoners.  It also constitutes an effective correctional management technique in that it can reduce tensions and frustrations that at times lead some prisoners to act out or cause disruptions to the good order of a facility.

36.     Because incarceration often causes economic hardship on inmates and their families, the use of the telephone, or video-visitation, is also an inadequate substitute for the type of meaningful communication offered through the exchange of written letters. Letters can wait in the mailbox all day, or for several days, before the intended recipient might be available to retrieve it and read the contents. Conversely, the success of an inmate's telephone call from inside a jail depends on the immediate availability of the person whom he or she is trying to reach.

37.     The postcard only policy also limits meaningful communication because postcards contain a very small amount of space on which to write a message. My experience is that inmates and their correspondents typically communicate through letters that contain significant amounts of information that would not fit in the space provided for writing on a postcard. The nature of time spent confined in a detention center yields substantial opportunity for inmates to write thoughtful, detailed letters communicating a wide variety of personal information to those in their support networks on the outside. Similarly, it is my experience that family members of inmates typically write letters containing multiple pages of information due to the limited amount of communication available through alternative means. The nature of a postcard also makes it more difficult to send typed correspondence, drawings from children, or family photos, as sending photos appears to be prohibited under mail policy unless the family

member knows how to and can spend the money to create a photo postcard.

38.    Because postcards are less private, a postcard policy also creates additional security problems because inmates can more easily read the mail of other inmates. This creates the possibility that private information could be used against the inmate who received the postcard, which could lead to violence or other problems. The lack of privacy for postcards is also likely to discourage some friends and family members from discussing private, meaningful topics for fear they will be seen by others. This undermines the interest in allowing inmates to maintain meaningful relationships while incarcerated. It will also inhibit private communications from people like religious leaders and mental health professionals who sometimes communicate with inmates going through a difficult period in their lives.

39.    It is my professional opinion that there is no valid, rational connection between the policies banning all incoming publications addressed to individual prisoners, and non-postcard correspondence generally, and any security interest.

### *Restriction on Books Based Upon Size*

40.    Reading educates, occupies idle hours, builds experiences and generally improves the mental health and well-being of prisoners.  As discussed previously, mailroom staff have a number of means by which to inspect incoming mail for contraband.  Any perceived security threat posed by the delivery of books can be easily overcome by the use of these security measures.  Moreover, the imposition of a size restriction on books allowed into the jail does not meaningfully improve security.  Knox County makes a narrow exception for donated books so long as they are within the 6" x 9" size restriction.  The fact that a book exceeds the 6" x 9" restriction, however, lacks any real practical correlation to the time it takes to inspect the item, or its propensity to contain contraband. The process of accepting an incoming book is the same regardless of whether the book is a small paperback within this 6" x 9" limit, or whether the book is in a larger format.  In my experience with detainees, I have observed that the books of interest in this population often includes legal self-help books like those published and distributed by Human Rights Defense Center, which come in larger formats similar in width and

height to a regular sheet of paper. Specifically, I have reviewed *The Habeas Citebook: Ineffective Assistance of Counsel*, the book at issue in this case. Even though it slightly exceeds the size limits in terms of length and width, it presents no more risk than smaller books and publications. In fact, under Knox County's current book size restriction, technically a book will be accepted into the facility that is 6" x 9" but over 6" inches thick, but a book that is 7" x 10" but .5" inches thick, would be disallowed. This seems counter-intuitive to the jail's already misguided policy on book size restrictions ostensibly premised on security grounds.

41. Based upon my experience, I do not see how this policy promotes a legitimate penological objective.

### Summary and Conclusion

42. In sum, based on my experience directly managing and overseeing the management of correctional and detention institutions, it is my professional judgment that mail policies and practices that restrict letter correspondence, deny prisoners access to books, magazines, or other publications, and restrict the size of certain books, inhibit security and good order. With reasonable security procedures commonly in place at detention facilities, jail security is not threatened by letters or by books and magazines sent by PLN. Furthermore, excessive interference with the communication between inmates and their family members, such as with video-visitation, causes those relationships to deteriorate, increases recidivism and creates a greater likelihood that inmates become alienated instead of successfully reintegrating with

society at large upon their release. In addition, prisoners and detainees who cannot access a reasonable amount of reading material become unnecessarily idle, which can lead to boredom, frustration, and disruptive behavior.

43.     I declare under penalty of perjury under the laws of the United States and the State of Maryland that the foregoing is true and correct, and that this declaration is executed at Gaithersburg, Maryland this _2 9_ day of September 2015.

_____
John L. Clark

DECLARATION OF JOHN L. CLARK IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION