UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| PRISON LEGAL NEWS, a project of the HUMAN RIGHTS DEFENSE CENTER, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No.:  3:15-CV-452-TAV-CCS |
| KNOX COUNTY, TENNESSEE, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This civil action is before the Court on plaintiff's Motion and Memorandum in Support of Injunctive Relief [Doc. 49] and defendant's Motion for Summary Judgment and Response in Opposition to Plaintiff's Motion for Permanent Injunction [Doc. 58]. The parties have also filed further responses and replies [Docs. 62–63]. The parties' motions are therefore fully briefed and ready for disposition. *See* E.D. Tenn. L.R. 7.1(a). For the reasons explained below, the Court will deny plaintiff's motion for a preliminary injunction and will deny defendant's motion for summary judgment as moot.

## I.     Background

This case concerns allegations that the defendant municipality violated plaintiff's First and Fourteenth Amendment rights to freedom of speech, due process, and equal protection by unlawfully censoring the books, magazines, and other mail plaintiff sent to prisoners at the Knox County Jail [Doc. 1]. The Court will first outline the factual allegations underlying this case before summarizing the relevant procedural history.

## A.  Factual History

The critical facts in this case are not in dispute.[1]  Plaintiff is a Washington nonprofit corporation, headquartered in Florida, that aims to promote education, advocacy, and outreach in support of the rights of federal and state prisoners [Doc. 1 ¶ 9].  Plaintiff publishes a monthly journal of corrections news and analysis, *Prison Legal News*, as well as various books about the criminal justice system and legal issues affecting prisoners, who account for sixty-five percent of plaintiff's subscribers [*Id.*].  Plaintiff distributes these publications to prisoners and libraries in more than 2,600 federal and state correctional facilities in the United States [*Id.* ¶ 16].  Plaintiff asserts that these publications contain "core protected speech and expressive conduct on matters of public concern, such as the operations of prisons facilities, prison conditions, prisoner health and safety, and prisoners' rights," as well as "the destructive nature of racism, sexism, and the economic and social costs of prisons to society" [*Id.* ¶¶ 18–19].

Defendant is a Tennessee municipality that operates the Knox County Jail (the "Jail"), primarily under the supervision of the Knox County Sheriff's Office [*Id.* ¶ 12].  At the time this litigation began, defendant maintained a written policy concerning the forms of incoming mail that detainees at the Jail were permitted to receive [*Id.* ¶ 49].  This policy effectively required all incoming mail, with the exception of legal mail, to be in the form

---

[1] The Court draws this summary from the factual allegations in plaintiff's complaint [Doc. 1] that are now undisputed in light of defendant's amended answer [Doc. 46] and the parties' stipulations as to liability and damages [Doc. 48].  The Court also notes that the legal issues it addresses in this opinion largely do not turn on questions of disputed fact.

of "a standard postcard with printed postage" [Doc. 1-1 p. 1]. The Sheriff's Office website further provided that "[i]nmates may receive correspondence only on a standard postcard, rectangular at least 3-1/2 inches high x 5 inches long x 0.007 inch thick[,] no more than 4-1/4 inches high x 6 inches long x 0.016 inches thick" [Doc. 1-2 p. 3]. Defendant likewise characterizes this as a "post-card only inmate mail policy" [Doc. 46 p. 2].

As for books and other publications, the policy provided that if the Jail's library lacked a book or publication a prisoner wished to read, the prisoner could receive the item through the mail, subject to the Facility Commander's discretionary approval [Doc. 1-1 p. 5]. Books were subject to specific requirements—i.e., they had to be paperback and no larger than 6 inches by 9 inches, prisoners could only keep two books in their cell at a time, and once a prisoner had read a book, it had to be placed with the prisoner's personal property or donated to the library [*Id.*]. Additionally, the Jail's 2011 Inmate Handbook expressly stated that outside "publications will **not** be accepted," absent the Facility Commander's prior approval of an inmate's request [Doc. 3-7 p. 8]. Finally, these rules allowed only prisoners—not outside senders—to request approval to transmit books and publications [Doc. 1 ¶ 54]. Plaintiff thus asserts that this policy deprived outside senders of any procedural protections at all, such as notice or meaningful opportunity to contest a discretionary decision by the Facility Commander [*Id.* ¶ 52].

Plaintiff claims that, from November 2014 to at least October 2015, the Jail refused to accept and deliver to prisoners every journal, book, brochure, and piece of enveloped mail plaintiff sent to the Jail—amounting to 147 items [*Id.* ¶ 21]. This figure includes: (1)

at least 111 copies of *Prison Legal News* [*Id.* ¶ 28]; (2) at least twelve copies of *The Habeas Citebook: Ineffective Assistance of Counsel*, a paperback instructional guide published by plaintiff [*Id.* ¶¶ 33–34]; (3) twelve copies of plaintiff's 2014 Fundraiser [*Id.* ¶ 39]; and (4) twelve informational brochure packets concerning plaintiff's mission and publications [*Id.* ¶¶ 43–45]. Plaintiff asserts that such censorship has frustrated its mission of education and advocacy, has interfered with its ability to recruit new donors, writers, and supporters, and can reasonably be expected to continue in the future [*Id.* ¶¶ 63–64]. Plaintiff further submits that defendant failed to provide it with notice of or opportunity to contest these censorship decisions [*Id.* ¶¶ 28, 34, 40, 46]. As such, plaintiff argues that defendant violated plaintiff's First and Fourteenth Amendment rights to freedom of speech, due process, and equal protection [*Id.* ¶¶ 73–90].

**B.    Procedural History**

The procedural history of this case is lengthy and complex, yet ultimately relevant to the subject matter of this opinion. Plaintiff filed its complaint on October 6, 2015, seeking monetary, injunctive, and declarative relief against defendants Knox County, Tennessee, Knox County Sheriff James "J.J." Jones, and Assistant Chief Deputy of the Knox County Sheriff's Office Rodney Bivens [Doc. 1]. Plaintiff simultaneously filed a motion for a preliminary injunction [Doc. 2]. Defendants filed an answer on December 18, 2015, and included a counterclaim for a declaratory judgment [Doc. 25]. Defendants also responded in opposition to plaintiff's preliminary injunction motion [Doc. 26]. Plaintiff then sought dismissal of defendants' counterclaim under Federal Rule of Civil Procedure

12(b)(6) [Doc. 29]. On February 3, 2016, upon cross-motions by the parties concerning the possibility of mediating this dispute [Docs. 32–33], the Court stayed these proceedings to permit the parties to participate in private mediation [Doc. 34]. Those efforts ultimately proved unsuccessful [Doc. 37].

Nevertheless, on October 13, 2016, defendants filed an amended answer in which they admitted liability on plaintiffs' First and Fourteenth Amendments claims under 42 U.S.C. §§ 1983 and 1988, stated that they had revised the Jail's inmate mail policy to avoid further constitutional violations, and withdrew their counterclaim [Doc. 46]. Defendants noted that, having reviewed similar lawsuits initiated by plaintiff throughout the country, they had decided not to contest the constitutionality of the Jail's mail policy [*Id.* at 2–3]. Defendants also attached a copy of the revised policy, which removes the restrictions that formed the basis for plaintiff's constitutional challenges [Doc. 46-1]. Then, on June 26, 2017, the parties filed a joint stipulation agreeing that: (1) plaintiffs' claims against defendants Jones and Bivens should be dismissed with prejudice; (2) plaintiff sustained $25,000 in compensatory damages as a result of defendant's unconstitutional practices, and summary judgment should be granted in plaintiff's favor in that amount; and (3) the first two stipulations resolve all issues in this litigation except for plaintiff's entitlement to injunctive relief, attorney's fees, and costs [Doc. 48].

Plaintiff then moved for a permanent injunction to prevent a resumption of defendant's admittedly unconstitutional practices in the future [Doc. 49]. Defendant responded by moving the Court to compel a judicial settlement conference, contending that

mediation could dispose of the only remaining issues in this litigation [Doc. 50]. Defendant also moved the Court to treat plaintiff's motion for a permanent injunction as an amended complaint [Doc. 51]. The Court referred this latter motion to Magistrate Judge C. Clifford Shirley, Jr. [Doc. 54], and, finding defendant's motion meritless, Magistrate Judge Shirley ordered defendant to respond to plaintiff's motion by September 8, 2017 [Doc. 56]. Defendant did so, but in opposing plaintiff's motion, defendant also moved for summary judgment under Federal Rule of Civil Procedure 56 on plaintiff's permanent injunction claim [Doc. 58]. Defendant also filed a second, "renewed" motion to compel a judicial settlement conference, on the same grounds [Doc. 59].

In support of its summary judgment motion, defendant attached sworn declarations of former defendants Jones and Bivens, as well as Knox County Law Director Richard B. Armstrong, Jr. [Docs. 57-1, 57-2, 57-3]. Jones avers that: (1) he is in his final year of his term as Sheriff; (2) he concurred in the decision to admit liability after being advised of the clearly established requirements of the First and Fourteenth Amendments; and (3) he knows he may be subject to personal liability in the future—including for punitive damages—if he reinstates the former unconstitutional policy [Doc. 57-1]. Bivens, the senior official in charge of correctional policies, plans to retire at the time of Jones's departure and likewise notes his awareness that he could be subject to personal liability in the future if the Jail resumes its unlawful practices [Doc. 57-2]. Finally, Armstrong avers that defendant's voluntary cessation of its unconstitutional conduct is genuine [Doc. 57-3 ¶ 2]. In support of this claim, Armstrong provides that: (1) this case has been extremely

expensive for Knox County taxpayers; (2) returning to the former unconstitutional policies would be irrational as a waste of taxpayer resources; (3) such a decision would also expose the pertinent policymakers to personal liability for punitive damages, for which defendant is barred by county ordinance from indemnifying them; (4) by county ordinance, the Law Director has discretion to furnish counsel for Knox County officials and employees when sued; and (5) Armstrong intends to meet with the new Sheriff, once sworn in, and explain both the clear requirements of the First and Fourteenth Amendments and that his office will not furnish counsel for any policymaker who adopts or reinstates written policies that contravene those requirements [Doc. 57-3 ¶¶ 3–8].

Plaintiff responded on October 6, 2017, arguing that that no local or federal rule permits a party to subsume a dispositive motion—here, a motion for summary judgment— within its response to another party's dispositive motion [Doc. 62 p. 2]. Plaintiff further asserts that, even if this were not the case, defendant did not file its motion until eight days after the dispositive motion deadline of September 1, 2017 [*See* Doc. 44 ¶ 6(b)]. Finally, plaintiff argues that, in any event, it is entitled to a permanent injunction on the merits [Doc. 62 pp. 3–6]. Plaintiff did not attach any Rule 56(c) materials, or other supporting evidence, to its response brief. Defendant then filed a reply, asserting that it had previously granted plaintiff a two-week extension to respond to certain discovery requests on the condition that plaintiff would "extend the same courtesy to [defendant] in responding to any discovery or motions" [Doc. 63 p. 2]. Defendant attached email correspondence between the parties' counsel substantiating this explanation [Doc. 63-1]. Defendant thus

apologizes for failing to file a joint motion for extension of time and requests relief from its eight-day delay in moving for summary judgment [Doc. 63 p. 2].

Finally, on October 24, 2017, the Court entered an order denying both of defendant's motions to compel a judicial settlement conference [Doc. 65]. According to a subsequent joint status report, the parties believe that the chances of settlement via private mediation on the remaining two issues are poor [Doc. 66 ¶ 5]. Thus, the Court will proceed to determine whether plaintiff is entitled to injunctive relief at this time.

## II.     Analysis

The Court will first consider plaintiff's motion for a permanent injunction against defendant's concededly unconstitutional practices [Doc. 49]. The propriety of injunctive relief in this case turns on two questions: (1) whether defendant's admission of the illegality of the old mail policy and voluntary termination of such practices has rendered plaintiff's request for injunctive relief moot; and (2) if not, whether plaintiff is entitled to an injunction under ordinary principles of equity. As explained further below, the Court need only address the first question because it agrees with defendant that the voluntary cessation exception to mootness does not apply in this case. The Court will then consider defendant's corresponding motion for summary judgment, which the Court will deny as moot in light of its ruling on plaintiff's motion for injunctive relief.

### A.     Plaintiff's Motion for a Permanent Injunction

First, defendant argues that, because the question of plaintiff's entitlement to injunctive relief is now moot, the Court lacks authority under Article III of the Constitution

to resolve that issue [Doc. 58 pp. 7–14].  Anticipating this argument, plaintiff argues in its motion that the "voluntary cessation" exception to mootness applies, such that this Court does have authority to enter plaintiff's requested injunction [Doc. 49 pp. 10–13].

Article III of the United States Constitution extends the federal judicial power to only a limited set of enumerated "cases" and "controversies."  U.S. Const. art. III, § 2. The Supreme Court has long interpreted this language to hold that "federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them."  *North Carolina v. Rice*, 404 U.S. 244, 246 (1971).  In addition to the standing, ripeness, political question, and advisory opinion doctrines, this means that federal courts lack authority to hear actions that, while once involving a live case or controversy, have since become moot.  *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000).  "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).  The parties here do not dispute that, on this definition alone, plaintiff's request for ongoing injunctive relief is moot as a result of defendant's discontinuance of its unconstitutional practices.

There are, however, several recognized exceptions to the mootness doctrine.  As the Supreme Court observed in *City of Mesquite v. Aladdin's Castle, Inc.*, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  455 U.S. 283, 289 (1992); *accord United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953).  "Otherwise, a defendant

could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). The fact that "[t]he defendant is free to return to his old ways, . . . together with a public interest in having the legality of the practices settled, militates against a mootness conclusion" in such circumstances. *W.T. Grant Co.*, 345 U.S. at 632. On the other hand, the exception does not apply if "subsequent events made it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)). The party claiming mootness—here, defendant—bears the "'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (alteration in original) (quoting *Friends of the Earth*, 528 U.S. at 189).

These general principles are well-settled. What the parties dispute is how stringent a showing the Sixth Circuit requires under the particular circumstances of this case—i.e., where the voluntary cessation comes at the hands of a governmental entity or official, rather than a private actor. Common sense suggests that the decision of such a defendant to admit wrongdoing and change its ways is entitled to greater confidence than in an ordinary dispute among private litigants. *See* 13C Charles Alan Wright et al., *Federal Practice and Procedure* § 3533.7 (3d ed. 2002) ("Courts are more apt to trust public officials than private defendants to desist from future violations."). As such, "cessation of . . . allegedly illegal

conduct by government officials has been treated with more solicitude by the courts than similar action by private parties." *Ammex, Inc. v. Cox*, 351 F.3d 697, 705 (6th Cir. 2003) (quoting *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990)). "[S]uch self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine." *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981 (6th Cir. 2012) (Varlan, J.) (quoting *Mosley*, 920 F.2d at 415); *accord Fed'n of Adver. Indus. Reps., Inc. v. City of Chicago*, 326 F.3d 924, 929 (7th Cir. 2003) (noting that *Friends of the Earth* "is the appropriate standard for cases between private parties, but this is not the view [courts] have taken toward acts of voluntary cessation by government officials").

Defendant asserts that it has carried its burden of showing that its change of policy was genuine, such that the issue of injunctive relief is indeed moot. Defendant first cites to *Bench Billboard*, where a manufacturer of advertising benches sued the City of Cincinnati to challenge the legality of an ordinance that limited the manufacturer's ability to place its benches on public and private property. 675 F.3d at 977. The parties settled the dispute and the City granted Bench Billboard a special exemption from the ordinance, which the City later revoked. *Id.* Bench Billboard then filed a second suit, but the City amended the relevant ordinance multiple times during the pendency of litigation. *Id.* at 977–78. The last such amendment, occurring after the parties cross-moved for summary judgment, entirely prohibited advertisements on bus stops and on benches in public rights-of-way. *Id.* at 979. Relying on *Kentucky Right to Life, Inc. v. Terry*, 108 F.3d 637 (6th Cir. 1997), and *Brandywine, Inc. v. City of Richmond*, 359 F.3d 830 (6th Cir. 2004), the

Sixth Circuit affirmed the district court's finding that this amendment mooted Bench Billboard's First Amendment claims. 675 F.3d at 981–82.

The court distinguished *Aladdin's Castle* on the ground that "[c]ritical to the holding [in that case] . . . 'was the City's announced intention to reenact the unconstitutional ordinance if the case was dismissed as moot.'" *Id.* at 981 (quoting *Ky. Right to Life*, 108 F.3d at 645). The court also distinguished *Friends of the Earth* on the ground that, while a stricter showing is necessary in litigation between private parties, the final amendment in *Bench Billboard* "was years in the making, . . . attempted to provide a framework for private uses of the public rights-of way within the City[,] and . . . appear[ed] genuine." *Id.* at 982. Moreover, the City never conceded that its prior practices were unconstitutional and had entirely replaced the repealed ordinance with a new statutory structure, which did not seem to raise any constitutional issues. *Id.* The court therefore found that Bench Billboard's claims for injunctive and declaratory relief were moot. *Id.*[2]

Defendant next cites to *Love v. Johnson*, No. 15-11834, 2016 WL 4437667 (E.D. Mich. Aug. 23, 2016), a decision concerning a challenge to the Michigan Secretary of State's requirements for changing one's gender on a state-issued ID card. The court there held that the Secretary's decision to amend its policy and accept U.S. passports to validate an applicant's gender rendered the action moot. *Id.* at *4. Relying on *Brandywine* and

---

[2] However, this finding "did not nullify Bench Billboard's claim for money damages." *Bench Billboard*, 675 F.3d at 980 n.2. In other words, a case may be moot with respect to certain forms of relief, but not others. *See Brandywine*, 359 F.3d at 836. This is true here as well—the parties have already agreed that plaintiff is entitled to compensatory damages [Doc. 48 ¶ 2].

*Bench Billboard*, the court found that the Secretary's decision appeared genuine because she had not expressed any intent of reverting to the old policy. *Id.* at *3. Furthermore, "[r]eincarnating the old [p]olicy would be a significant waste of state resources and, as a practical matter, a fool's errand," given the court's earlier decision that the policy implicated strict scrutiny. *Id.* Finally, the court rejected the plaintiff's argument that unlike *Bench Billboard* and *Brandywine*, which involved legislative repeals of challenged laws, here an executive official had "exercised her unfettered discretion in unilaterally changing the policy" and was "completely unconstrained from changing it back again." *Id.* Drawing such a sharp line between legislative and executive action would "render voluntary governmental compliance meaningless outside of the legislative sphere," contrary to "what the Sixth Circuit intended by specifically distinguishing self-corrective measures adopted by government officials from private parties." *Id.*[3]

Defendant argues that this case is analogous to *Brandywine*, *Bench Billboard*, and *Love*. Defendant notes that the relevant Knox County policymakers have now declared to the Court, under oath, that they will not reinstate the Jail's former mail policy. These officials have also indicated their awareness that doing so would expose them again to

---

[3] Defendant also cites to *Lyda v. City of Detroit* (*In re City of Detroit*), where the Sixth Circuit held that a procedural due process claim arising out of the City of Detroit's termination of water services was mooted by the City's alteration of those procedures after litigation began. 841 F.3d 684, 693–94 (6th Cir. 2016). The plaintiffs in *Lyda* did not ask the court to apply the voluntary cessation exception. *Id.* at 694 n.4. The court nonetheless noted that the exception would not apply in any event because "[v]oluntary cessation of a disputed procedure negates mootness only when 'legislators . . . publicly expressed an intention to re-enact the offending legislation.'" *Id.* (omission in original) (quoting *Brandywine*, 359 F.3d at 836).

personal liability—including for punitive damages—and that the Law Director's office would not furnish them counsel in such litigation. Defendant asserts that, while these officials could theoretically reinstate the old policy in the future, doing so "would fly in the face of their sworn declarations to this Court" and would make little legal or practical sense [Doc. 58 p. 13]. Defendant further notes that it is undisputed that the old policy is no longer in effect, and plaintiff has admitted that the new policy is constitutional [*See* Doc. 57-5 pp. 3–4 ("[Plaintiff] is currently unaware of any additional constitutional violations committed . . . after October 13, 2016.")]. Defendant argues that, under these circumstances, the Court can no longer "affect the legal relations between the parties," and thus plaintiff's request for injunctive relief is moot. *Love*, 2016 WL 4437667, at *3 (quoting *Cam I, Inc. v. Louisville/Jefferson Cty. Metro Gov't*, 460 F.3d 717, 719–20 (6th Cir. 2006)).

Plaintiff argues, by contrast, that the voluntary cessation exception to mootness applies in this case. Plaintiff first notes that, as a general rule, "[t]he voluntary cessation of challenged conduct does not ordinarily render a case moot." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012). Plaintiff further argues that defendant here cannot meets its "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190. Specifically, plaintiff claims that defendant must demonstrate it entered into an "unconditional and irrevocable" agreement with plaintiff that it would not revert to its unconstitutional practices to meet its burden. *Already, LLC*, 568 U.S. at 93. Instead, according to plaintiff, defendant has refused to consent to a permanent injunction despite

admitting liability to all three claims in plaintiff's complaint. Further, while recognizing the greater solicitude courts have afforded voluntary cessation by government officials, *Bench Billboard*, 675 F.3d at 981, plaintiff argues that "this does not alleviate [defendant] from the heavy burden of showing that the case is mooted" [Doc. 49 p. 12 (citing *Ammex, Inc. v. Cox*, 351 F.3d 697, 705 (6th Cir. 2003))].

Plaintiff relies primarily on two Sixth Circuit decisions in support of its argument. First, plaintiff cites to *Akers v. McGinnis*, 352 F.3d 1030 (6th Cir. 2003), where employees of the Michigan Department of Corrections challenged a rule barring all "non-work-related contact with prisoners, parolees, probationers . . . , their relatives and visitors," *id.* at 1033. After the employees brought suit, the Department amended this rule to clarify certain definitions and permit employees to request exemptions under specific circumstances. *Id.* at 1034. The Sixth Circuit held that this amendment did not moot the case for two primary reasons: (1) "the promulgation of work rules appear[ed] to be solely within the discretion of the [Department]"; and (2) "the plaintiffs could [have been] entitled to money damages and the purging of their disciplinary records if the old version of the [r]ule were found to be unconstitutional even if the current version was constitutional," thus requiring the court to examine all versions of the rule. *Id.* at 1035.

Plaintiff next cites to *A. Phillip Randolph Institute v. Husted*, 838 F.3d 699 (6th Cir. 2016), where activists claimed that Ohio's method for purging voters no longer eligible to vote from the rolls violated federal law, *id.* at 702. During the pendency of litigation, the Secretary of State issued a revised confirmation notice form that remedied all but one of

the plaintiffs' concerns.  *Id.* at 703–04.  The court noted that it is a "rare instance" when defendants will be able to carry the burden of proving that their allegedly wrongful behavior cannot reasonably be expected to recur.  *Id.* at 712 (quoting *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 473 (6th Cir. 2008)).  Further, while recognizing the special solicitude afforded government officials in this context, the court stated that "such solicitude does not carry much of an official's burden."  *Id.* at 713 (citing *Aladdin's Castle*, 455 U.S. at 289).  In light of these principles, the court held that the case was not moot.  *Id.* at 713.  The court distinguished *Bench Billboard* on the ground that the Secretary had issued the new notice form at his own directive, rather than by legislative process, and had revised this form on a relatively frequent basis—i.e., four times in the prior nine years.  *Id.*  Moreover, as an elected official, the next Secretary might well change the form again.  *Id.*  But most notably, the Secretary's voluntary cessation did not appear genuine because "he issued [the] form on the same day as the parties' final merits briefs were due . . . , attaching the form as an exhibit to his brief and only then presenting his mootness argument."  *Id.*  Such timing "d[id] not inspire confidence in his assurances regarding the likelihood of recurrence."  *Id.*[4]

---

[4] Plaintiff also cites to a Fourth Circuit decision, *Porter v. Clark*, where the court noted that "a governmental entity's change to a challenged policy does not moot an action when the government retains authority to 'reassess . . . at any time' the change and revert to the challenged policy."  852 F.3d 358, 365 (4th Cir. 2017) (omission in original) (quoting *Pashby v. Delia*, 709 F.3d 307, 316–17 (4th Cir. 2013)).  The same opinion notes, however, that such a change does moot the action "when the governmental entity 'has not asserted its right to enforce [the challenged policy] at any future time.'"  *Id.* at 364 (alteration in original) (quoting *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1231 (4th Cir. 1989)).  Thus, the Court finds *Porter* consistent with the principles of Sixth Circuit law discussed above.

After reviewing the arguments advanced and authorities cited by both parties, the Court finds that defendant has carried its burden of showing that it will not readopt an unconstitutional mail policy in the future. At the outset, the Court notes that the various Sixth Circuit decisions cited by the parties are, at least on their face, somewhat inconsistent. In other words, these decisions appear to require showings of varying levels of stringency from government officials or entities that voluntarily cease unlawful practices. Yet, despite this apparent inconsistency, the Court finds that these decisions are in fact reconcilable. The critical consideration is whether the government has come forward with sufficient evidence to convince the Court that its policy reversal is genuine, candid, and intended as permanent, rather than designed merely to defeat the instant litigation. If so, the Sixth Circuit has repeatedly emphasized that "such self-correction provides a secure foundation for a dismissal based on mootness." *Bench Billboard*, 675 F.3d at 981. Accordingly, the contrasting results in the cases discussed above are best explained by differing practical assessments of the sincerity of the governmental actor's decisionmaking.

With that in mind, the Court finds that this case more closely parallels the decisions in *Brandywine*, *Bench Billboard*, *Lyda*, and *Love*, than those in *Ammex, Inc.*, *Akers*, and *A. Phillip Randolph*. As in *Bench Billboard*, defendant has now entirely replaced the Jail's former policy concerning inmate mail with a new set of written standards [Doc. 46-1], which plaintiffs have never claimed raise any constitutional concerns. And, while this decision came from executive officials rather than the legislative process, those officials have provided sworn declarations admitting the unconstitutionality of the former policy

and promising not to return to such practices in the future. Like in *Bench Billboard*, *Lyda*, and *Love*, the officials here have never expressed any intention of reverting to the old policy should the case be deemed moot—quite the contrary. As such, the skepticism concerning the sincerity of the government's decisionmaking that the Supreme Court expressed in *Aladdin's Castle* is simply not present here. *See Ky. Right to Life*, 108 F.3d at 645 (holding that the exception discussed in *Aladdin's Castle* "properly applies only when a recalcitrant legislature clearly intends to reenact the challenged regulation"). This conclusion is further reinforced by Law Director Armstrong's sworn declaration that his office will not provide counsel for any official who adopts an unconstitutional mail policy, and that he will explain this to Jones's and Bivens's successors. Moreover, Armstrong's acknowledgments that this litigation has been quite expensive for Knox County and that reverting to an unlawful mail policy would be an irrational waste of taxpayer resources instill further confidence in the Court as to the sincerity of defendant's admissions.

In addition, the Court finds the two cases cited by plaintiff as factually analogous— *Akers* and *A. Phillips Randolph*—to be distinguishable. Unlike in *Akers*, there is no need here for the Court to scrutinize the constitutionality of the old mail policy because the parties have already stipulated to its illegality. And, while the relevant officials in this case have discretion, as in *Akers*, to alter the policy again in the future, the officials here have been notified that the Law Director's office will not defend them in the litigation that would inevitably arise were they to readopt an unconstitutional policy. This, along with the officials' likely personal liability for punitive damages and Knox County's legal inability

to indemnify payments for such damages, will disincentivize any return to wrongdoing in the future. In addition, this case is distinguishable from *A. Phillip Randolph* both for the same reasons just discussed and because the policy here has not been the subject of frequent revisions. Indeed, the Jail's mail policy has undergone even fewer revisions than in *Bench Billboard*, thus warranting a higher degree of confidence in the officials' sworn declarations that Knox County will not revert to an unconstitutional mail policy.[5]

But most importantly, all of the evidence here suggests that Knox County's decision to admit wrongdoing and replace the old policy is genuine. Unlike *A. Phillip Randolph*, defendant here did not issue the revised policy at the eleventh hour and only then claim mootness. Rather, of its own accord, defendant filed an amended answer explaining its reasons for adopting the old policy in the first place, admitted that the shortcomings in this system had produced constitutional violations, and attached a new policy fully addressing plaintiff's concerns [Docs. 46, 46-1]. Defendant then filed extensive documentation to demonstrate the sincerity of its reversal [Docs. 57-1–57-6]. Under these circumstances, the Court finds it highly improbable that defendant will reinstate an unconstitutional inmate mail policy for the Jail once this litigation concludes. Therefore, the Court is convinced that "there is no reasonable expectation that the wrong will be repeated" in the future. *W.T. Grant Co.*, 345 U.S. at 633.

---

[5] In addition, the Court notes that *Already, LLC*'s requirement of an "unconditional and irrevocable" agreement against future wrongdoing, 568 U.S. at 93, does not apply here because that case concerned a dispute between private litigants.

In sum, because defendant's voluntary termination of its unlawful practices mooted plaintiff's motion for a permanent injunction, the Court lacks Article III authority to furnish the relief that plaintiff seeks. As such, the Court need not consider the parties' arguments as to whether plaintiff is entitled to a permanent injunction under ordinary principles of equity [*See* Doc. 49 pp. 13–15; Doc. 58 pp. 4–6; Doc. 62 pp. 3–4; Doc. 63 pp. 2–3].[6] The Court will accordingly deny plaintiff's motion for a permanent injunction.

### B.      Defendant's Motion for Summary Judgment

The Court next considers defendant's motion for summary judgment on plaintiff's claims to equitable relief [Doc. 58]. At the outset, the Court notes the variety of procedural defects that might otherwise prevent it from ruling on this motion. First, defendant filed this motion eight days after the dispositive motion deadline passed and requested an extension of time to file the motion only after plaintiff brought defendant's tardiness to the Court's attention. Second, even if the Court were inclined to grant defendant's request for a retroactive extension of time, defendant included this motion in its response to plaintiff's motion for a permanent injunction. Plaintiff asserts that this is procedurally improper, and defendant has cited to no federal rule or statute permitting this tactic. And

---

[6] The Court notes that, in any event, the chief source of dispute between the parties on the merits of plaintiff's entitlement to injunctive relief is whether plaintiff has made an adequate showing of future irreparable harm. But that issue is, in this context, really one and the same with the mootness question. While it is true that, "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed," *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012), the likelihood that such impairment will occur in the future is inextricably bound up with the question whether defendant's voluntary cessation of its illegal practices is genuine. The Court's decision on that point thus resolves the irreparable harm issue as well.

finally, because plaintiff's entitlement to injunctive relief is an issue the Court may resolve upon plaintiff's motion and the parties' briefings, the procedural structure of Federal Rule of Civil Procedure 56 does not really help resolve the critical legal question at hand. As plaintiff puts the matter in its response brief, defendant's motion for summary judgment "does nothing to advance the legal issue before Court," i.e., whether plaintiff's claim for equitable relief is moot [Doc. 62 p. 3].

Regardless, as discussed above, the Court lacks authority under Article III to grant any relief on plaintiff's motion for a permanent injunction because that issue has become moot. This includes granting defendant the relief it seeks in its summary judgment motion. But because the Court will deny plaintiff's motion, defendant has obtained the relief it seeks in any event. Thus, the Court will deny defendant's motion as moot.

## III. Conclusion

Accordingly, for the reasons explained above, the Court **DENIES** plaintiff's motion for a permanent injunction [Doc. 49], and **DENIES as moot** defendant's motion for summary judgment [Doc. 58]. The Court notes, however, that this holding does not close this case. The parties have yet to file motions or briefs concerning plaintiff's entitlement to attorneys' fees under 42 U.S.C. § 1988—the sole remaining issue in dispute in this case [*See* Doc. 48 ¶ 3]. The Court encourages the parties to do so promptly, or to otherwise resolve that issue by mutual agreement.

The Court further notes that the appropriateness and amount of an award of attorney's fees are issues for the Court, not a jury, to resolve. *See Hensley v. Eckerhart*,

461 U.S. 424, 429–38 (1983) (providing the framework for district courts to apply in calculating a reasonable attorney's fee award under § 1988); *see also City of Riverside v. Rivera*, 477 U.S. 561, 567 (1986) (noting that § 1988 "authorize[s] the district courts to award reasonable attorney's fees to prevailing parties in specified civil rights litigation"). As such, there is no longer any need to conduct a jury trial in this matter.  Both the jury trial scheduled for January 29, 2018, and the final pretrial conference scheduled for January 22, 2018, are therefore **CANCELED**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE